THE NEWARK FIREMEN'S MUTUAL BENEVOLENT ASSOCIA-
TION, LOCAL NO. 4, PLAINTIFF-RESPONDENT, v. CITY OF
NEWARK, DEFENDANT-APPELLANT.

Argued March 8, 1982—Decided June 2, 1982.

*Rosalind L. Bressler*, Assistant Corporation Counsel, argued the cause for appellant (*John J. Teare*, Corporation Counsel, attorney; *Rosalind L. Bressler* and *Gene Truncellito*, Assistant Corporation Counsel, on the brief).

*David I. Fox* argued the cause for respondent (*Fox & Fox*, attorneys).

*Sidney H. Lehmann*, General Counsel, argued the cause for intervenor-respondent Public Employment Relations Commission (*Sidney H. Lehmann*, attorney; *Don Horowitz*, Deputy General Counsel, on the briefs).

*Melvin E. Mounts*, Deputy Attorney General, argued for *amicus curiae* State of New Jersey (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney; *Erminie L. Conley*, Former Assistant Attorney General, of counsel; *Michael L. Diller*, Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

PASHMAN, J.

This appeal concerns the conduct of binding arbitration under the fire and police arbitration act, L. 1977, c. 85, N.J.S.A. 34:13A–14 to –21. The City of Newark (City) attacks a Public Employment Relations Commission (PERC) rule on final offer arbitration, a type of binding arbitration in which, after formal hearings, the arbitrator must choose between the last offers of each party to the labor contract dispute. Formal hearings are held when the parties are unable to resolve their differences through negotiation and mediation. The challenged rule, N.J. A.C. 19:16–5.7, allows the arbitrator to accept revisions of the parties' "final offers" throughout the formal arbitration proceedings.

The City argues that N.J.A.C. 19:16–5.7(f) contravenes the statutory requirement that "final offers" be submitted to the arbitrator "[p]rior to the arbitration proceedings," N.J.S.A. 34:13A–16(f)(1). The City also contends that allowing such revisions frustrates the purpose of final offer arbitration as contemplated in the Employer-Employee Relations Act, N.J.S.A. 34:13A–1 to –21.

We find that PERC's rule does not contravene the Employer-Employee Relations Act and that it furthers the statute's public policy of "promot[ing] permanent, public ... employer-employee peace and the health, welfare, comfort and safety of the people of the State." N.J.S.A. 34:13A–2. We therefore uphold the regulation and affirm the judgment of the court, 177 N.J. Super. 239, below.

I

The fire and police arbitration act, L. 1977, c. 85, N.J.S.A. 34:13A– 14 to –21, established procedures to be followed whenever negotiations between a municipality and its fire or police employees reach an impasse. The statute permits the parties to select any of various methods for the resolution of their contract disputes. However, the parties must notify PERC if they

cannot agree upon a procedure for resolving their disputes 60 days prior to the budget submission date of the year in which the fire or police contract will take effect. *N.J.S.A.* 34:13A–16(b), [§ 16(b)]. If the parties cannot agree upon a dispute resolution procedure within 50 days of the budget submission date, they are required to follow the particular form of final offer arbitration codified at *N.J.S.A.* 34:13A–16(d)(2), [§ 16(d)(2)].

The budget submission date for Newark's 1979 city budget was January 15, 1979. About November 5, 1978, some 70 days before that time, plaintiff Newark Firemen's Benevolent Association (Association) notified PERC that it had not reached agreement with the City on the terms of its contract for 1979 and was therefore requesting that PERC appoint an arbitrator. Since the parties had not agreed upon a particular method for resolving their disputes, final offer arbitration was mandated by § 16(d).

The record does not reveal what transpired between the parties from November 1978 until the parties first met with Dr. Bernard J. Manney, the PERC-appointed arbitrator, on May 14, 1979.[1] Between May 14 and July 30, 1979, arbitrator Manney met with the parties five times to mediate the dispute without formal arbitration hearings. During this time, the arbitrator gained agreement on some issues and persuaded the parties to abandon certain proposals. By July 30, 1979 the City had raised its wage offer from no increase to a 5 percent increase. The Association's proposed wage hike had dropped to 9 percent from a substantially higher figure.

The arbitrator convened formal hearings on July 30, 1979. As required by *N.J.S.A.* 34:13A–16(f)(1), prior to these formal pro-

---

[1]The statute sets a deadline for the selection of a dispute resolution procedure, but no deadline for the commencement of arbitration or the resolution of the dispute. The Senate bill that became *L.*1977, *c.* 85; *S.*482 (1976), included a provision setting time limits for the commencement of arbitration, but the provision was deleted before passage.

ceedings the parties submitted their "final offers" in two separate parts. Pursuant to § 16(d)(2), each party submitted (a) a package offer including all the economic issues in dispute, and (b) separate offers on every other issue in dispute.[2] At the close of this first formal hearing, the Association submitted a revised offer on the economic issues, lowering its wage increase proposal from 9 percent to 8 percent, adjusting its request for nighttime differential pay, and dropping its demand for a dental plan. Such revisions in final offers are contemplated by the contested PERC rule, *N.J.A.C.* 19:16–5.7, which permits the arbitrator to accept revised offers until the formal hearing is deemed closed, provided that the other party has an opportunity to respond. Rather than revising its own economic offer, however, the City informed the arbitrator of its position that § 16(f)(1) of the fire and police arbitration act forbids revisions of the original offers submitted prior to the formal hearings in final offer arbitration.

There were 11 days of formal hearings. The Association made a second substantial revision of its economic package on October 2, 1979, reducing its wage proposal to 6½ percent. At the final hearing on October 4, 1979, the Association also made a minor revision of its economic offer regarding the computation of overtime pay. The City never revised its initial 5 percent wage hike offer. Both parties, however, revised their non-economic offers on August 9, 1979 after mediation by the arbitrator the preceding week apparently clarified the parties' positions on several issues.

On November 5, 1979, arbitrator Manney submitted his opinion and award. The arbitrator noted that after negotiation and arbitration the total difference in the dollar amounts of the

---

[2]The statute defines economic issues to include "those items which have a direct relation to employee income including wages, salaries, hours in relation to earnings, and other forms of compensation such as paid vacation, paid holidays, health and medical insurance, and other economic benefits to employees." *N.J.S.A.* 34:13A–16(f)(2). PERC has the sole authority to determine which issues are economic. *Id.*

parties' proposals was only $341,508, as compared to a city budget of almost $300 million. The arbitrator selected the Association's last offer on the economic package, calling for a 6½ percent wage increase, a prescription drug plan, an increase in the fire fighters' clothing allowance and higher longevity pay. The arbitrator chose some of the City's and some of the Association's last offers on the noneconomic issues still in dispute.

On November 9, 1979 the Association filed suit in the Superior Court, Chancery Division, seeking to confirm the award and have the City ordered to implement its terms. The City filed an answer and counterclaim seeking to vacate the award. In addition to challenging PERC's rule on revisions of final offers, *N.J.A.C.* 19:16–5.7, the City attacked the constitutionality of the fire and police arbitration statute and argued that the arbitrator's award was unsupported by substantial evidence.[3]

On December 20, 1979, after argument from the parties and intervenor PERC, Superior Court Judge Geoffrey Gaulkin entered an order confirming the arbitrator's award, ordering its prompt payment, and dismissing the City's counterclaims. Judge Gaulkin denied motions by the City for a stay of judgment on December 20, 1979 and January 3, 1980. The court also denied without prejudice the Association's request for interest on the amount of judgment and other supplemental relief. Emergent relief pending appeal was denied by the Appellate Division on January 23, 1980.

On January 31, 1980 Judge Gaulkin ordered that the award be paid by February 11, 1980 or he would begin taking testimony for possible contempt sanctions. Judge Gaulkin further ordered interest of 8 per cent retroactive to November 5, 1979 on the unpaid amount of the judgment. The City subsequently paid the award.

---

[3] The City abandoned its constitutional challenge before the Appellate Division. In addition, at oral argument before this Court, the City announced that it no longer sought to vacate the 1979 contract award. Thus, the sole issue in this appeal is whether *N.J.A.C.* 19:16–5.7 contravenes the statute.

The Appellate Division affirmed Judge Gaulkin's judgment confirming the 1979 contract award on January 29, 1981. This Court granted the City's petition for certification. 87 *N.J.* 348 (1981).

## II

The challenged PERC rule, *N.J.A.C.* 19:16–5.7, carries a "rebuttable presumption of validity" and the City has "the burden of proving [its] invalidity." *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 561 (1978); *In re Regulation F–22, Office of Milk Industry*, 32 *N.J.* 258, 261–62 (1960). "An administrative regulation . . . will not be set aside on the ground that it transgresses the statute unless the transgression is plain," *Lane v. Holderman*, 40 *N.J.Super.* 329, 335 (App.Div. 1956), aff'd. 23 *N.J.* 304 (1956), quoted in *New Jersey Guild*, 75 *N.J.* at 561. The City must therefore show more than the rule's inconsistency with one of several plausible interpretations of the fire and police arbitration act, *N.J.S.A.* 34:13A–14 to –21. The City must prove that allowing the parties in final offer arbitration hearings to modify their original offers would "alter the terms of [the] legislative enactment or frustrate the policy embodied in the statute." *N. J. Chamber of Commerce v. N. J. Elec. Law Enforce. Comm'n.*, 82 *N.J.* 57, 82 (1980).

To meet its burden, the City argues that *N.J.A.C.* 19:16–5.7 contravenes the statutory requirement that "final offers" be submitted to the PERC-appointed arbitrator prior to the arbitration hearings. *N.J.S.A.* 34:13A–16(f)(1). Section 16(f)(1) reads:

Prior to the arbitration proceedings, the parties shall submit to the arbitrator or tripartite panel of arbitrators, pursuant to rules and procedures established by the commission, their final offers in two separate parts: (a) a single package containing all the economic issues in dispute and (b) the individual issues in dispute not included in the economic package, each set forth separately by issue.

The City contends that use of the word "final" in this provision reveals the Legislature's unambiguous intent to prevent parties from modifying their offers once formal arbitration has begun. The City further contends that to allow such revisions frustrates

the statutory purpose of making resort to arbitration such a dangerous venture that the parties will settle their disputes expeditiously before facing arbitration hearings. For several reasons, we are not convinced by the City's argument.

■ First, the term "final offers" in the statute is ambiguous. The history of final offer arbitration reveals that "final" offers are generally not considered immutable. An early description of the process explained that

[a]t the commencement of the arbitration hearing, the parties would be required to submit their positions on each of the disputed issues . . . . The [arbitrator or arbitration panel] would be permitted to mediate the differences between the parties until the submission of the parties' "last offers" at the conclusion of the hearing. [Garber, "Compulsory Arbitration in the Public Sector: A Proposed Alternative," 26 *Arb.J.* 226, 227–28 (1971)]

In another article, Charles M. Rehmus, chairman of Michigan's Employment Relations Commission, stated that

so long as the parties wish to continue making new "final offers" which move in the direction of narrowing the gap between them, it hardly seems sensible to refuse to let them do so. [Rehmus, "Is a 'Final Offer' Ever Final?" *Monthly Labor Review* (September 1974) at 44]

In Wisconsin, a rule permitting only one amendment of the parties' final offers, at least five days prior to commencement of the arbitration hearing, reportedly was interpreted..by arbitrators to allow revisions of final offers until five days *after* the hearing began. Sterns, Rehmus, et al. *Final-Offer Arbitration, The Effects on Public Safety Employee Bargaining* (1975) at 181. A 1975 amendment to the Wisconsin act eliminated the five-day period restriction for modifying final offers. *Wis.Stat.* § 111.77(4)(b); *L.1975, c. 259.*

Section 16(f)(1) is identical to a provision recommended by the Public Employer-Employee Relations Study Commission in the model legislation which accompanied its report on labor relations in the public sector. *Report to the Governor Pursuant to L.1974, c. 124* (1976) at 77. That report discussed final offer arbitration in Wisconsin and Michigan where "final" offers are not immutable. *Id.* at 29–31. This shows that the commission which drafted the model legislation recognized that the word "final"

did not necessarily mean immutable. We can assume that the Legislature was acquainted with the contents of the report. Moreover, there is no clear indication of what the Legislature intended "final" offers to mean. The legislative history therefore demonstrates that the meaning of "final" in § 16(f)(1) is unclear.

In fact, the statute does not refer to "final offer" arbitration. It refers to arbitration under which "the award . . . shall be confined to a choice between . . . the *last offer* [of each party]." *N.J.S.A.* 34:13A–16(d)(2) (emphasis added). A semantic distinction thus exists between *"final"* offers, which must be submitted "prior to the arbitration proceedings," § 16(f), and *"last"* offers between which the arbitrator must choose. Although we do not rely on that distinction for our holding, the distinction lends further support to our conclusion that in requiring the submission of a final offer before arbitration, the legislators did not contemplate that these original offers would be the last offers to be weighed by the arbitrator.

The ambiguity of the term "final offers" belies the City's claim that PERC's rule contravenes the clear mandate of § 16(f)(1). The validity of *N.J.A.C.* 19:16–5.7 becomes more clear when we examine the entire statute and "look beyond the specific terms of the enabling act to the statutory policy sought to be achieved," *N.J. Guild*, 75 *N.J.* at 562. *See* 2A *Sands, Sutherland Statutory Construction* § 46.05 at 56 (4th ed. 1973).

■ The primary purpose of the fire and police arbitration act, *N.J.S.A.* 34:13A–14 to –21, is to provide an expeditious means to resolve labor disputes to the maximum benefit of the parties and the public. The act amended the Employer-Employee Relations Act, *N.J.S.A.* 34:13A–1 to –21, which declares a public policy of "voluntary mediation of . . . [labor] disputes . . . to promote permanent, public and private employer-employee peace and the health, welfare, comfort and safety of the people of the State." *N.J.S.A.* 34:13A–2. Consistent with this policy, the fire and police arbitration act declares an "expeditious,

effective and binding procedure for the resolution of disputes" as "requisite to the high morale of [police and fire] employees," because they "do not enjoy the right to strike." *N.J.S.A.* 34:13A–14. To this end, the act's provisions are to be liberally construed by PERC. *Id.* The Public Employer-Employee Relations Study Commission *Report to the Governor, supra,* states that "[a]rbitration of impasses that ends in a binding award should aim at settlements that are fair to the parties and in the public interest." *Id.* at 30. The report notes the increasing likelihood of labor protest "when a marked expansion in collective negotiations takes place in the midst of inflationary pressures, declining employment, budget stringency, and growing taxpayer resistance." *Id.* at 23. Thus, one preeminent goal of binding arbitration is "an award that is most acceptable, or least objectionable, to both parties." *Id.* at 27.

Against this background, we reject the City's contention that the Legislature sought a draconian type of final offer arbitration in which original offers could not be revised. Such arbitration would indeed hang a sword over the parties' head to encourage settlements before arbitration. But as Judge Gaulkin pointed out in the Chancery Division, the sword would hang over the heads of the public as well.

Nothing is gained by a rigid application of final offer arbitration that requires the selection of an unreasonable offer after the parties have narrowed their differences. Preventing the revision of offers in final offer arbitration is unnecessary for the expeditious and effective resolution of employment disputes. The parties have compelling incentive to submit reasonable offers prior to the arbitration hearing, since *N.J.A.C.* 19:16–5.7 permits revisions of those offers only at the discretion of the arbitrator, and only until the arbitrator closes the hearing. PERC's rule therefore preserves the arbitrator's power to expedite negotiations by threatening an unreasonable party with the possibility of total loss through selection of the opponent's offer. Yet it does so without forcing the arbitrator to choose between unreasonable awards that disserve the public.

*N.J.A.C.* 19:16–5.7 is further supported by the portion of the statute that provides, "[t]hroughout formal arbitration proceedings the chosen arbitrator or panel of arbitrators may mediate or assist the parties in reaching a mutually agreeable settlement." *N.J.S.A.* 34:13A–16(f)(3). This provision would be weakened if the parties could not modify their offers after arbitration had begun. It also undermines the City's contention that the Legislature sought a rigid form of final offer arbitration precluding negotiation that could lead to the modification of original offers. We have noted that

> the basic policy upon which the entire Employer-Employee Relations Act is bottomed ... [is] that the "*voluntary* [resolution] of ... disputes ... will [best] tend to promote permanent, public and private employer-employee peace and the health, welfare, comfort and safety of the people of the State." *N.J.S.A.* 34:13A–2. [*N. J. State PBA, Local 29 v. Irvington*, 80 *N.J.* 271, 286 (1979)]

Any law that prevents the parties in labor negotiations from narrowing their differences impedes the voluntary resolution of labor disputes. Likewise, awards that unreasonably favor either party in public sector labor relations are inimical to employer-employee peace and the public welfare. They can exacerbate government's already severe fiscal problems or undermine the morale and welfare of the employees who make government work. An interpretation of § 16(f)(1) that foreclosed all negotiation during the arbitration hearings mandated by the fire and police arbitration act would thus subvert the legislative policy.

The City interprets § 16(f)(3) to mean that the arbitrator can accept a settlement between the parties during the formal hearings if, but only if, they reach complete agreement on all issues. Otherwise, the arbitrator must select one of the two original offers. It would be counterproductive, however, to select one of two more extreme offers after the arbitrator had prompted the parties to narrow their differences and submit more reasonable offers, perhaps falling just short of complete

agreement.[4]  Even an initially reasonable economic offer can become unreasonable once the parties have resolved some of their other disputes.  When a party to negotiations submits its "final" economic package proposal prior to arbitration, it presumably takes into account the cost of its non-economic proposals.  The resolution of certain non-economic disputes during the hearing, as happened in this case, would affect that party's calculations as to what constitutes a reasonable economic offer.  A rule barring the revision of original offers could irrationally force even those parties who submit reasonable original offers to live with outdated and therefore unreasonable proposals.

### III

*N.J.A.C.* 19:16–5.7 advances the goals of binding arbitration in the public sector, and there is every reason to grant PERC deference in its interpretation of the fire and police arbitration act.  The selection of procedures for the resolution of public sector labor disputes lies at the heart of PERC's expertise.  The commission has broad experience in its regulation of unfair labor practice disputes, *see State v. Council of N. J. State College Locals,* 153 *N.J.Super.* 91 (App.Div.1977), certif. den., 78 *N.J.* 326 (1978), as well as scope-of-negotiations disputes, *see Galloway Tp. Bd. of Ed. v. Galloway Tp., Ass'n of Educational Secretaries,* 78 *N.J.* 1 (1978).  Deference to an administrative agency is particularly appropriate where, as here, new and innovative legislation is being put into practice.  In *State v. Prof. Assoc. of N. J., Dept. of Ed.,* 64 *N.J.* 231 (1974), the Court upheld PERC's determination as to the proper bargaining unit for certain state employees, noting that

> it is particularly important in the early phases of development of experience in this relatively new area of the administrative process that a broad and flexible latitude of interpretation of the statute be accorded the agency charged with its implementation.  [64 *N.J.* at 259]

---

[4]The City acknowledged at oral argument that such a result would be troubling.

PERC contends that *N.J.A.C.* 19:16–5.7 works well and has become an integral aspect of final offer arbitration in police and fire department negotiations. The commission's position comports with a survey taken by two New Jersey arbitrators in which "[t]he overwhelming majority of arbitrators reported that the parties often made modifications in position during the mediation and hearing process." Stochaj and Weitzman, "Attitudes of Arbitrators Toward Final Offer Arbitration in New Jersey," 35 *Arb.J.* 25, 30 (1980). PERC likewise reports that arbitrators have successfully used mediation in many instances to obtain revised offers that significantly narrowed the differences between the parties. In the very arbitration that prompted this appeal, the City of Newark revised its non-economic proposals in the midst of arbitration, after the arbitrator had devoted a session to mediation. The City's decision to avail itself of the benefits of *N.J.A.C.* 19:16–5.7, even while contesting the rule's validity, lends further support to PERC's argument that the rule has become an integral part of effective and expeditious final offer arbitration.

We do not condone the lengthy process that apparently was necessary to resolve this dispute. A full year passed between the parties' request for binding arbitration and the arbitrator's opinion and award. The prompt resolution of labor disputes is a primary goal of the fire and police arbitration act. That goal does not require rigid forms of negotiation that create unreasonable awards that may produce a fiscal crisis and labor protest. It does require the appointed arbitrators to begin arbitration promptly and to resolve it expeditiously.

We hold that *N.J.A.C.* 19:16–5.7 properly effectuates the policies of the fire and police arbitration act. The judgment of the Appellate Division is affirmed.

SCHREIBER, J., dissenting.

No exercise of judicial power is more suspect than the Court's substitution of its judgment for that of the Legislature on a

matter that is inherently legislative. When the Court engages in that exercise, it places the judiciary in the paradoxical position of violating the constitutional safeguard of separation of powers. Judicial activism that operates to subvert that principle serves to undermine the confidence of the public in the entire judicial process. Because today's decision does just that, I am impelled to dissent. My colleagues ignore the plain legislative intent and substitute their wisdom for that of the Legislature.

Courts should adhere to the Legislature's language when it is plain, unambiguous and uncontrolled by other statutory provisions, when that reading is not absurd and when it is in conformity with the purposes of the legislation. *See Renz v. Penn Central Corp.*, 87 *N.J.* 437, 440 (1981); *In re Jamesburg High School Closing*, 83 *N.J.* 540, 547 (1980); 2A *Sands, Sutherland Statutory Construction* § 46.01 (4th ed. 1973). It is this interpretative guide with its constitutional underpinning that is to be applied in this case. First, then, the language of the statute must be examined. The pertinent provision reads as follows:

> *Prior to the arbitration proceedings* the parties shall submit to the arbitrator ... their *final offers* in two separate parts: (a) a single package containing all the economic issues in dispute and (b) the individual issues in dispute not included in the economic package, each set forth separately by issue. [*N.J.S.A.* 34:13A–16(f)(1) (emphasis supplied)]

This language strongly suggests, indeed compels the thought, that before the arbitration proceedings begin, the parties must submit their last offers. Nothing in the statute or in its history indicates that the Legislature had any other idea in mind. The draft of proposed legislation submitted by the Public Employer-Employee Relations Study Commission contained language identical to *N.J.S.A.* 34:13A–16(f)(1). *Report to the Governor and the Legislature Pursuant to L.1974, c. 124* (1976) at 37, Appendix B at 97. The Report does not suggest that this language means anything other than what it states.

Subdivision 16(c) of *N.J.S.A.* 34:13A supports the proposition that the Legislature intended "final offers" to be submitted

"[p]rior to the arbitration proceedings." That provision encourages the parties to voluntarily adopt some procedure that would lead to a resolution of the impasse. To that end the Legislature suggested six possible schemes, ranging from conventional arbitration on all unsettled items to "last offer" arbitration on a single package including economic and non-economic issues. Five suggestions involved variations of "last offer" arbitrations, none of which required that the "final offers" be submitted "[p]rior to the arbitration proceedings" as required in *N.J.S.A.* 34:13A–16(f). For example, one proposed method was:

> Arbitration under which the award by an arbitrator or panel of arbitrators is confined to a choice between (a) the last offer of the employer and (b) the last offer of the employee's representative, as a single package. [*N.J.S.A.* 34:13A–16(c)(2)]

In that situation offers might properly be made throughout the arbitration proceeding. This is to be contrasted with the requirement in subsection 16(f) that final offers must be made "[p]rior to the arbitration proceedings." The Study Commission, which, as noted above, had drafted subsection (f), also drafted and recommended subsection 16(c). The Commission members included some leading members of the labor-management bar, unquestionably knowledgeable in this field. I submit they wrote what they intended.

Since the statutory language is quite unambiguous and plain, attention must then be directed to whether such a reading is sensible and in harmony with the legislative purposes. It is certainly arguable that compelling the parties to make their final offers prior to the commencement of the arbitration proceeding accords with the legislative policy evidenced in *N.J.S.A.* 34:13A–14 of furthering expeditious and effective resolutions of labor disputes involving public employees. With this sword hanging over their heads parties will be encouraged to strive desperately to settle before arbitration proceedings begin, rather than risk total loss under final-offer arbitration. Proponents of final-offer arbitration contend that it expedites settlement of labor disputes and avoids long, costly and dragged out arbitration hearings. *See* Nelson, "Final-Offer Arbitration: Some

Problems," 30 *Arb. J.* 50, 51 (1975); Long and Feuille, "Final Offer Arbitration: 'Sudden Death' in Eugene," 27 *Indus. & Lab. Rel. Rev.* 186, 190 (1974); Grodin, "Either-Or Arbitration for Public Employee Disputes," 11 *Indus. Rel.* 260, 263 (1972). *See generally* Note, "Final Offer Arbitration: The Last Word in Public Sector Labor Disputes," 10 *Colum. J. L. & Soc. Prob.* 525 (1974).

Requiring an early submission of final offers creates a meaningful deadline for reaching agreement prior to using the impasse process. As Professor Stevens notes, deadline pressures tend to reduce the amount of bluffing in negotiations and tend to alter the least favorable terms each side is willing to accept. *See C. M. Stevens, Strategy and Collective Bargaining Negotiations* 100 (1963). As one writer in the field explains:

> As the parties move closer and closer together, it would be highly likely that they would be able to reach agreement rather than submit the issues to arbitration. Thus, the primary goal of assuring that the parties reach agreement through negotiations would be achieved. [Garber, "Compulsory Arbitration in the Public Sector: A Proposed Alternative," 26 *Arb. J.* 226, 232]

It is interesting that the PERC methodology of permitting modification of offers during the arbitration process has been counter-productive in that the parties have not engaged in meaningful negotiation prior to initiation of the arbitration. *See* Weitzman and Stochaj, "Attitudes of Arbitrators Toward Final-Offer Arbitration in New Jersey," 35 *Arb. J.* 25, 34 (1980). Moreover, there is no uniformity in practice as to when final offers may be submitted. The Weitzman-Stochaj study reveals that every conceivable variation has been used: before the start of the hearing, at the outset of the hearing, during the hearing, at the close of the hearing, and after the close of the hearing. *Id.* at 30. Thus the PERC experience has not been evenhanded and has postponed pressure on both parties, delaying rather than expediting settlement.

Professor Feuille suggests that where a binding outcome is deemed necessary, it is advisable to require the final offer at an "early last possible moment." He argues:

A crucial requirement is that the selection decision shall be between the two final offers originally submitted and shall not be based on any movement that occurred during mediation. Once the impasse moves to arbitration the arbitrator shall have no authority to remand the dispute back to the parties for additional bargaining. [Feuille, "Final-Offer Arbitration and Negotiating Incentives," 32 *Arb. J.* 203, 216 (1977)]

Moreover, the possibility of the parties maintaining unreasonable positions as a final offer before arbitration begins is remote, given the fact that this procedure essentially rewards the party being reasonable and punishes the party being extreme. This concept of making final offers before the arbitration proceedings start is not unique. It is a method that has been used successfully. The labor contract of the City of Eugene, Oregon fixes the submission deadline five days before the arbitration process begins. This plan has worked well in expediting settlements.[1] It has also been adopted in major league baseball

---

[1] The following table reflects the success of this plan:

Eugene Negotiation-Arbitration Experience (1971–76)

| Employee Group | Arbitration Invoked? | Outcome |
|---|---|---|
| 1971–72 negotiations: | | |
| Fire Fighters | Yes | City first offer selected |
| Police Patrolmen | Yes | Agreement negotiated during arbitration proceedings |
| AFSCME | Yes (binding fact-finding) | Union position selected |
| 1972–73 negotiations: | | |
| Fire Fighters | Yes | City alternate offer selected |
| Police Patrolmen | No | Negotiated agreement |
| AFSCME | Yes | Agreement negotiated during arbitration proceedings |
| 1974–75 negotiations: | | |
| Fire Fighters | No | Negotiated agreement |
| Police Patrolmen | No | Negotiated agreement |
| AFSCME (salary reopener) | No | Negotiated agreement |
| 1975–76 negotiations: | | |
| Fire Fighters (salary reopener) | No | Negotiated agreement |
| Police Patrolmen (salary reopener) | No | Negotiated agreement |
| AFSCME | Yes | Agreement negotiated during arbitration proceedings |

collective bargaining agreements. *See* J. B. Dworkin, "The Impact of Final Offer Interest Arbitration on Bargaining: The Case of Major League Baseball," (Purdue University, Krannert Graduate School of Industrial Administration, Working Paper No. 554, June 1976), *discussed in* Feuille, "Final-Offer Arbitration," *supra*, 32 *Arb. J.* at 209. The majority claims that the public will suffer if the parties cannot amend their offers until an arbitration award is made. This claim impliedly assumes that if final offers must be made before the arbitration proceeding begins, hard negotiations will not have occurred. Industrial management experts question this assumption. Moreover, some experience has disproved it. Whether these proponents or the majority are correct is a matter of judgment.

The majority also asserts that the plain and unambiguous language of the statute should not be interpreted as it reads because of the provision in *N.J.S.A.* 34:13A–16(f)(3) that during the arbitration proceedings the arbitrator "may mandate or assist the parties in reaching a mutually agreeable settlement." That section does not conflict with final-offer pre-arbitration proceedings. The parties, of course, may continue to attempt to settle the matter during arbitration. In fact, the alternative that faces them is such that they both should more readily reach agreement. In other words, the impetus for settlement exists, and, if their last offers before the proceedings commenced were substantially divergent, the compulsion to settle would be even greater than if the parties were allowed to amend their offers during the arbitration proceedings.

The bottom line of my difference with the majority is that the statute as worded does make sense. The arguments advanced

SOURCE: Peter Feuille, *Final Offer Arbitration: Concepts, Development, Techniques*, Public Employee Relations Library, series no. 50 (Chicago: International Personnel Management Association, 1975), p. 17; and Gary Long, Personnel Director, City of Eugene, telephone conversation, October 11, 1976. [Reprinted in Feuille, "Final-Offer Arbitration," *supra*, 32 *Arb. J.* at 208]

by the majority are thoughts that the Legislature may properly consider, and presumably did, but did not find persuasive. This is not to say that the Legislature could not reconsider and modify the final-offer plan in such manner as it deems fit. That is a legislative and not a judicial choice.

Lastly, PERC's expertise as an administrative agency is not at all compelling under these circumstances. We are concerned with a matter of law involving a new statute. No amount of expertise can justify promulgation of a regulation in conflict with the statute. PERC only has the authority to make regulations that implement the provisions of that statute. *See Abelson's, Inc. v. N. J. State Board of Optometrists*, 5 *N.J.* 412, 423–24 (1975).

I would reverse and enter judgment for the defendant.

Justice CLIFFORD joins in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, HANDLER, POLLOCK and O'HERN—5.

*For reversal*—Justices CLIFFORD and SCHREIBER—2.