223 N.J. Super. 166 (1988)
538 A.2d 410
IN RE APPLICABILITY OF ECRA TO THE ROBERT L. MITCHELL TECHNICAL CENTER.
Superior Court of New Jersey, Appellate Division.
Argued February 9, 1988.
Decided March 1, 1988.
*167 Before Judges PRESSLER, BILDER and GIBSON.
Robert J. DelTufo argued the cause for petitioner Celanese Corporation (Hannoch Weisman, attorneys; Robert J. DelTufo, Sanders M. Chattman, Richard J. Conway, Jr. and Deborah S. Kinburn, on the brief).
Paul H. Schneider, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (W. Cary Edwards, Attorney General of New Jersey, attorney; Michael R. Clancy, Deputy Attorney General, *168 of counsel; Michael S. Caro, Deputy Attorney General, on the brief).
The opinion of the court was delivered by BILDER, J.A.D.
This is an appeal by Celanese Corporation from a decision of the Department of Environmental Protection denying its request for a determination that its research and development facility in Summit (Robert L. Mitchell Technical Center) is not subject to the provisions of the New Jersey Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 et seq.
In 1983 the Legislature enacted ECRA and thereby held owners or operators of industrial establishments accountable for environmental problems on their properties. It accomplished that goal by requiring that the property be in an environmentally appropriate condition as a precondition to its closure, sale or transfer. The precondition can be met by a negative declaration that no contamination by hazardous substances exists on the property or by a cleanup plan which will detoxify it. See N.J.S.A. 13:1K-6 et seq. And see Note, The Environmental Cleanup Responsibility Act (ECRA): New Accountability for Industrial Landowners in New Jersey, 8 Seton Hall Legis. J. 331 (1985).
In a very general and oversimplified sense, industrial establishments subject to the act are places of business which engage in operations involving hazardous substances and which conduct an operation designated in a Standard Industrial Classification Manual (SICM) as having a Standard Industrial Classification (SIC) number starting with 22-39 inclusive, 46-49 inclusive, 51 or 76. N.J.S.A. 13:1K-8f. Thus ECRA does not apply to establishments whose business does not fall within a designated SIC number. Property owners who believe they are not *169 subject to ECRA may apply to DEP[1] for a written finding that ECRA does not apply to their property. See Note, ECRA: New Accountability, supra at 358-359. Such a finding is known as a letter of nonapplicability. Applications must be supported by affidavits clearly describing the reasons for nonapplicability. Ibid.
Celanese is the owner of a research facility in Summit in which Celanese, its affiliates and others research new materials, products, processes and designs and develop them to a stage where a decision can be made to abandon further development, transfer the technology for use at a full manufacturing facility or transfer the technology to a third party. Most of its efforts are directed at the development of new products not presently produced by Celanese. According to a Celanese affidavit:
The primary purpose of operations at the site is to research and develop new materials, processes and/or designs from inception to the point where developmental and market exploratory activities indicate commercial viability (i.e., through pilot plant scale production and initial sales testing to determine whether construction of a commercial manufacturing facility at some other location is merited by market demand).
....
The facilities available at the site to service these research and development functions include laboratories (chemical testing, physical testing, and classic analytical chemistry), state-of-the-art analytical and computer systems (including electron microscopy, optical microscopy, spectro chemistry, infrared spectrometry, mass spectrometry, thermal analysis, x-ray difraction), an extensive technical information center, pilot plant facilities, engineering and traditional office support services.
Most of its recent efforts (60% of the expenses and 70% of the employees during 1985 and 1986) are related to new materials not presently produced or sold by Celanese. The remainder of its efforts (40% of the expenses and 30% of the employees during the same years) are directed to applied research into *170 existing products of Celanese and pilot plant production. Some of the research involves third parties and some is done pursuant to government contracts.
In November of 1986, Celanese entered into an agreement whereby its stock would be purchased by Hostachem Acquisition Incorporated and its business then merged with that company. In connection with that transaction, Celanese sought a letter stating that ECRA was not applicable to the transfer of the Summit research facility  a letter of nonapplicability. DEP determined that the facility is an auxiliary establishment of Celanese and subject to ECRA. It advised Celanese:
This decision is due to the presence of an industrial establishment, specifically the Robert L. Mitchell Technical Center, Celanese Corporation. In Mr. Schult's[2] affidavit it was stated that the research is in support of some of the manufacturing activities of Celanese. It is recognized that a majority of the research and development is of products that are not presently produced by Celanese however the decision of whether this technology is to be utilized is determined by Celanese. The fact that the work performed at this facility is entirely dedicated to the tasks of research and development for new and improved products, processes and designs which may or may not be manufactured by Celanese it is this Department's opinion that this laboratory is an auxiliary establishment of Celanese Corporation. This laboratory is not primarily engaged in the research, development and testing of products for the general public or for other business firms on a fee or contract basis therefore the Department contends that the Standard Industrial Classification (SIC) number of 7391 would be inappropriate for this facility. [DEP letter of April 8, 1987 to Celanese]
Celanese appeals, contending that the facility is not an industrial establishment within the meaning of ECRA and the Standard Industrial Classifications that act incorporates by reference; that it cannot be made a covered enterprise by use of the Standard Industrial Classification Manual's reference to "auxiliary units"; that the application of ECRA to this research facility when a similar facility which is unconnected with a covered establishment is exempt would be an unconstitutional denial of equal protection; and that the use of the auxiliary *171 rules would be a denial of due process because of statutory vagueness.
N.J.S.A. 13:1K-8f in pertinent part provides:
"Industrial establishment" means any place of business engaged in operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances or wastes on-site, above or below ground, having a Standard Industrial Classification number within 22-39 inclusive, 46-49 inclusive, 51 or 76 as designated in the Standard Industrial Classification Manual prepared by the Office of Management and Budget in the Executive Office of the President of the United States....
Auxiliary establishments are defined, in pertinent part, as follows:
An auxiliary unit is an establishment primarily engaged in performing supporting services for other establishments of the same company rather than for the general public or for other business firms. Auxiliaries include such diverse activities as research, development, and testing laboratories of manufacturing firms developing new or improved products with the company's own funds or on Federal contract.... [SICM, supra at 583]
and are classified on the basis of the primary activity of the operating establishment they serve. See SICM, supra at 584.
As we have already noted, DEP concluded that the research facility had an auxiliary relationship with Celanese and therefore should be classified on the basis of Celanese's activity  that it fell within an ECRA designated SIC category. DEP rejected the argument that the facility fell within SIC category 7391 (independent research facility) because it is, in effect, a captive facility. See SICM, supra at 305.[3]
The problem before us is essentially one of statutory construction. An examination of ECRA and of the SICM in the light of that act discloses the correctness of the DEP position. Read in accordance with its plain meaning, see Service Armament Co. v. Hyland, 70 N.J. 550, 556 (1976), it is clear that *172 ECRA encompasses all places of business whose activities, as defined by the SICM, have the designated classification numbers (and handle hazardous materials). The notion that a part of the SICM is not to be utilized in this determination comes not from the statute but from Celanese's unwarranted construction. Plainly and simply, the legislature has directed that the SICM be consulted and if it classifies an operation within the designated classifications (and the other requirements of the act are met), the place of business which conducts that operation is covered by ECRA.
Moreover, statutes should be construed in a commonsense manner which will advance their legislative purpose. See Cressey v. Campus Chefs, Div. of CVI Service, Inc., 204 N.J. Super. 337, 342-343 (App.Div. 1985). The legislature sought to deal with potential risks, see N.J.S.A. 13:1K-7, and to require appropriate environmental attention to sites on which designated operations are conducted which have a potential to leave hazardous substances on the land. It is a matter of common sense that an auxiliary operation, such as the Summit facility, may well be handling hazardous substances of the same or similar nature to those handled in Celanese's primary activities. Interestingly enough, Celanese seems to suggest that its other major research centers at Corpus Christi, Texas and Charlotte, North Carolina might meet the statutory coverage of ECRA. Implicit in this argument is the notion that these other facilities, operated as research facilities for Celanese's manufacturing groups, have a closer relationship to the type of operations giving rise to ECRA concerns and can therefore more logically be categorized with those manufacturing operations. Celanese seems to suggest that because the Summit facility's research efforts are in large measure directed at new materials not presently produced or sold by Celanese[4], the facility is not primarily engaged in performing supportive services for other *173 establishments of Celanese. The notion is a non sequitur. Celanese's application for a letter of nonapplicability makes it clear that the facility's primary purpose is to find new materials, processes or designs for its own commercial use. One can presume Celanese hopes for new and additional products that will eventually be produced by the manufacturing components of the business. In any event, whether to pursue the manufacturing or processing of new products is a business judgment controlled by Celanese. ECRA coverage does not depend on the success of those efforts or Celanese's business judgment.
As a statute which seeks to protect the public health and welfare, ECRA is entitled to a liberal construction which will achieve its beneficial, indeed critical, purposes. See In re Environmental Protection Dep't, 177 N.J. Super. 304, 318 (App.Div. 1981). The legislature was not unaware that the breadth of ECRA's coverage might encompass non-toxic sites. It was for this reason it provided for negative declarations  written declarations that there have been no discharges of hazardous substances or wastes on the site or that such conditions have been cleaned up and no longer exist. See N.J.S.A. 13:1K-8g. If the Summit site presents no hazard, Celanese has a convenient alternative. See N.J.A.C. 7:1-3.10 and .11.
Finally, we note that the interpretation of the agency to which the legislature has given the responsibility for the administration of ECRA is entitled to great weight. See Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327 (1984); In re Application of Saddle River, 71 N.J. 14, 24 (1976). Celanese contends DEP's construction would render ECRA unconstitutional as violative of equal protection and void for vagueness in violation of due process. Both claims are meritless. It is reasonable to infer that if a company is engaged in a business whose operations may threaten the environment, its auxiliary operations may pose a similar threat and should be subject to the same regulation. The inclusion of auxiliary activities is neither irrational nor arbitrary. See Barone v. *174 Department of Human Services, 107 N.J. 355, 364-365 (1987). DEP's construction of the statute results from its plain language. The vagueness argument advanced by Celanese can only result from a quixotic reading.
Affirmed.
NOTES
[1] Application technically is made to the Bureau of Industrial Site Evaluation, a bureau within DEP. See Note, ECRA: New Accountability, supra at 358-359.
[2] The Director of Human Resources and Administration of the Summit facility.
[3] Category 7391 encompasses establishments "primarily engaged in laboratory or other physical research and development on a contract or fee basis." Captive facilities are specifically excluded. "Research and development laboratories of companies which manufacture the products developed from their research activities are classified as auxiliary to the manufacturing establishments served."
[4] As already noted, in 1985 and 1986, 60% of the facility's expenses and 70% of its employees were dedicated to new products.