608 A.2d 288

IN RE ADOPTION OF N.J.A.C. 7:26B.

PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, NEW JERSEY ENVIRONMENTAL LOBBY, AND KEITH ONSDORFF, AND SOCIETY FOR ENVIRONMENTAL ECONOMIC DEVELOPMENT, ASHLAND CHEMICAL COMPANY AND COOPER INDUSTRIES, INC., RESPONDENTS, AND CHEMICAL INDUSTRY COUNCIL OF NEW JERSEY, RESPONDENT AND CROSS–APPELLANT, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, APPELLANT AND CROSS–RESPONDENT.

Argued January 22, 1992—Decided July 7, 1992.

*Gerard Burke,* Deputy Attorney General, argued the cause for appellant and cross-respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel).

*Richard E. Wallace, Jr.,* a member of the District of Columbia bar, and *Kenneth H. Mack* argued the cause for respondents and respondent and cross-appellant (*Picco, Mack, Herbert, Kennedy, Jaffe & Yoskin,* attorneys; *Richard E. Wallace, Kenneth H. Mack,* and *Susan C. Gieser,* on the briefs).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal is the most recent chapter in New Jersey's ongoing efforts to clean up hazardous waste emanating from industrial sites. The appeal concerns the Environmental Cleanup Responsibility Act (ECRA), *N.J.S.A.* 13:1K–6 to –13, which requires the owners and operators of industrial sites either to develop a cleanup plan for real property contaminated by hazardous waste or to certify in a "negative declaration," *N.J.S.A.* 13:1K–8g, as a condition precedent to the closing, sale, or transfer of a business or real property, that cleanup is unnecessary. More precisely, the appeal focuses on the definitions of "cleanup plan" and "industrial establishment" in *N.J.A.C.* 7:26B–1.3, which was adopted by the Department of Environmental Protection (DEP) to implement ECRA.

As defined in that regulation, the term "cleanup plan" requires owners and operators of industrial establishments to include in their plans off-site wastes that have emanated from on-site sources. The Appellate Division found the definition to be beyond the scope of DEP's authority. 250 *N.J.Super.* 189, 243–46, 593 *A.*2d 1193 (1991). The court granted a partial stay of this portion of its judgment "only as to existing cleanup orders, plans or agreements presently in force and relating to off-site contamination in force on May 6, 1991." It upheld the definition of "industrial establishment," which subjects to ECRA's requirements vacant land that is contiguous to the business plant of the industrial establishment and is controlled by the establishment's owner or operator.

We granted DEP's petition to review the Appellate Division's invalidation of the definition of "cleanup plan." 126 *N.J.* 387, 599 *A.*2d 163 (1991). We also granted the cross-petition of Ashland Chemical Company, Cooper Industries, Inc., the Chemical Industry Council of New Jersey, and the Society for Environmental Economic Development, *ibid.,* which challenges the validity of the inclusion of adjoining lots in the DEP definition

of "industrial establishment." We now hold that both defini-
tions are within the statutory authority delegated to DEP.

-I-

Decades of industrial activity have left this state with a
legacy of hazardous waste. That legacy now threatens the
state's public health and ecology. In an affidavit filed by the
DEP in support of its application for a stay of the Appellate
Division judgment, Lance R. Miller, Assistant Commissioner in
charge of DEP's Waste Management Program, states that
"New Jersey has several thousand known or suspected sites
contaminated by hazardous substances and wastes * * *." He
warns that the resultant risk "to human health and the environ-
ment * * * is compounded by the fact that almost half (49%) of
New Jersey's population relies on ground water supplies for its
drinking water." According to Assistant Commissioner Miller,
ECRA "has been the mainstay of the State's hazardous waste
cleanup program * * *. As a result of ECRA, more than 1,759
cleanups of industrial facilities have been completed or are
underway throughout the State of New Jersey at an estimated
cost of more than $478 million."

All parties acknowledge that ECRA's legislative history is
meager. We gain some insight into the intent of the Legisla-
ture, however, by considering the background and purpose of
the statute. The Legislature enacted ECRA in response to the
inordinate time and money spent in determining fault and
apportioning liability for the dumping of toxic wastes. *See*
*Superior Air Prods. v. NL Indus.*, 216 *N.J.Super.* 46, 63, 522
*A.*2d 1025 (App.Div.1987). The seven years consumed in litigat-
ing *Department of Environmental Protection v. Ventron
Corp.*, 94 *N.J.* 473, 468 *A.*2d 150 (1983), and the discovery of
dioxin at the Newark site of Diamond Shamrock Corporation
ten years after the closure of that site alerted the Legislature
to the need for a more expeditious administrative response.
*See NL Indus., supra,* 216 *N.J.Super.* at 62, 522 *A.*2d 1025;

Gregory Battista, Note, *The Environmental Cleanup Responsibility Act (ECRA): New Accountability for Industrial Landowners in New Jersey,* 8 *Seton Hall Legis. J.* 331, 332 (1985).

Senator Raymond Lesniak introduced the legislation believing it would "finally place full responsibility for rectifying damage done to New Jersey's environment on the generators of the toxic waste problem." Deborah L. Munt, *State–Initiated Hazardous Waste Management Programs: New Jersey's Environmental Cleanup Responsibility Act, Innovations* (Council of State Gov't, Lexington, Ky.) Jan. 1989, at 1, 3. When enacting ECRA, the Legislature described the purposes of the statute:

> The Legislature finds and declares that the generation, handling, storage and disposal of hazardous substances and wastes pose an inherent danger of exposing the citizens, property and natural resources of this State to substantial risk of harm or degradation; that the closing of operations and the transfer of real property utilized for the generation, handling, storage and disposal of hazardous substances and wastes should be conducted in a rational and orderly way, so as to mitigate potential risks; and that it is necessary to impose a precondition on any closure or transfer of these operations by requiring the adequate preparation and implementation of acceptable cleanup procedures therefor. [*N.J.S.A.* 13:1K–7.]

Thus, the essential goal of ECRA is to secure the cleanup of industrial sites at the earliest possible date. *Dixon Venture v. Joseph Dixon Crucible Co.,* 235 *N.J.Super.* 105, 110, 561 *A.*2d 663 (App.Div.1989), *aff'd,* 122 *N.J.* 228, 584 *A.*2d 797 (1991).

To this end, the statute requires as a precondition to closure, sale, or transfer that the property of an "industrial establishment" be in an environmentally appropriate condition. Owners and operators can satisfy the precondition by submitting either a negative declaration or a cleanup plan. *In re Fabritex Mills,* 231 *N.J.Super.* 224, 227, 555 *A.*2d 649 (App.Div.1989). In brief, ECRA requires the owner or operator planning to close, sell, or transfer operations: (1) to notify the DEP within five days of its intention to engage in any of the triggering events; (2) on closure or within sixty days before the transfer or sale, to submit a cleanup plan or a "negative declaration" that there has been no hazardous discharge or that the discharge has been

cleaned up; and (3) to obtain financial security guaranteeing performance of the cleanup plan. *N.J.S.A.* 13:1K–9.

The purpose of these obligations is to assure the cleanup of property even if the current owner or operator is not responsible for the contamination. In this sense, the statute focuses on the environmental wrong, not the wrongdoer. Identification of the polluter plays no part in the ECRA process, which imposes a "self-executing duty to remediate." *NL Indus., supra,* 216 *N.J.Super.* at 63–65, 522 *A.*2d 1025.

■ Cross-appellants point out that the bare words of the statute emphasize on-site pollution. That emphasis, however, does not lead to the conclusion that the Legislature intended to ignore pollution that migrates from one site to another. Nothing in the words or history of ECRA suggests that the Legislature intended that owners or operators should clean up the source of pollution and ignore its pernicious effects on adjoining lands. As DEP points out, the public concern arising from the discovery of dioxin in Newark was not just for the pollution of the Diamond Shamrock site, but for adjacent residential and commercial properties. Similarly, the environmental concern in our decision in *Ventron,* which preceded the adoption of ECRA by less than two months, was not just for the source of pollution, but for the surrounding land and waterways to which the pollution was migrating. In light of these facts, we would do a disservice to the Legislature to conclude that it took so myopic a view of environmental problems as to ignore off-site pollution. Our role is not so much to address a problem that the Legislature did not consider as to bridge the apparent gap between the legislative intent and the expression of that intent in the statute.

The overarching legislative imperative as set forth in *N.J.S.A.* 13:1K–10 is unmistakable:

> a. The department [DEP] shall, pursuant to the "Administrative Procedure Act," P.L.1968, c. 410 (C. 52:14B–1 et seq.) adopt rules and regulations establishing: minimum standards for soil, groundwater and surface water quality necessary for the detoxification of the site of an industrial establishment,

including buildings and equipment, to ensure that the potential for harm to public health and safety is minimized to the maximum extent practicable, taking into consideration the location of the site and surrounding ambient conditions; criteria necessary for the evaluation and approval of cleanup plans; * * * and any other provisions or procedures necessary to implement this act. * * *

b. The department shall, within 45 days of submission, approve the negative declaration, or inform the industrial establishment that a cleanup plan shall be submitted.

c. The department shall, in accordance with the schedule contained in an approved cleanup plan, inspect the premises to determine conformance with the minimum standards for soil, groundwater and surface water quality and shall certify that the cleanup plan has been executed and that the site has been detoxified.

Thus, the Legislature has directed DEP to identify the events that trigger ECRA and the amount of land or waste governed by the statute. Failure to comply with ECRA can result in the invalidation of the sale or transfer of the industrial establishment and in the imposition of liability for all cleanup and removal costs, including damages resulting from the failure to provide a cleanup plan. *N.J.S.A.* 13:1K–13.

-II-

Traditionally, we accord administrative regulations a presumption of reasonableness. *Medical Soc'y of N.J. v. New Jersey Dep't of Law and Pub. Safety,* 120 *N.J.* 18, 25–26, 575 *A.*2d 1348 (1990); *In re Amendment of N.J.A.C. 8:31B–3.31,* 119 *N.J.* 531, 543, 575 *A.*2d 481 (1990); *Smith v. Director, Div. of Taxation,* 108 *N.J.* 19, 25, 527 *A.*2d 843 (1987); *In re Barnert Memorial Hosp. Rates,* 92 *N.J.* 31, 41, 455 *A.*2d 469 (1983); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561, 384 *A.*2d 795 (1978). A reviewing court "is not confined to consideration of the statutory authority for a particular regulation cited by the administrative agency but may consider the entire enabling legislation in order to ascertain 'if there is in fact sufficient underlying authority.'" *Long, supra,* 75 *N.J.* at 561, 384 *A.*2d 795 (quoting *In re Weston,* 36 *N.J.* 258, 263, 176 *A.*2d 479 (1960)).

■ Our deference does not go so far as to permit an administrative agency under the guise of an administrative interpretation to give a statute any greater effect than is permitted by the statutory language. *See Kingsley v. Hawthorne Fabrics, Inc.*, 41 *N.J.* 521, 528, 197 *A.2d* 673 (1964) (Director of Taxation exceeded statutory authority by classifying brother who did not live in same household as "immediate family" under the statute). Accordingly, we have invalidated regulations that flout the statutory language and undermine the intent of the Legislature. See *Medical Soc'y, supra,* 120 *N.J.* at 25, 575 *A.2d* 1348.

■ The ultimate question is whether the agency's interpretation is permissible under the broad language of the statute. *In re Barnert Memorial Hosp. Rates, supra,* 92 *N.J.* at 39–40, 455 *A.2d* 469. In answering that question, courts may look beyond the language of the statute to the circumstances and objectives surrounding its enactment. *In re Amendment of N.J.A.C. 8:31B-3.31, supra,* 119 *N.J.* at 545, 575 *A.2d* 481; *Long, supra,* 75 *N.J.* at 562, 384 *A.2d* 795; *see Newark Firemen's Mut. Benevolent Ass'n v. City of Newark,* 90 *N.J.* 44, 52–55, 447 *A.2d* 130 (1982) (upholding Public Employee Relations Committee Rule allowing arbitrator to accept revisions of parties' "final offers" throughout formal arbitration proceeding to facilitate statutory purpose of expeditious and mutually beneficial resolution of labor disputes). With matters that affect public health, we have readily implied such powers as are necessary to effectuate the legislative intent. *See New Jersey Ass'n of Health Care Facilities v. Finley,* 83 *N.J.* 67, 78–79, 415 *A.2d* 1147 (1980) (sustaining implied power of Department of Health to determine "reasonable cost" requires nursing homes to provide sufficient bed space for indigents); *Long, supra,* 75 *N.J.* at 562, 384 *A.2d* 795. We have been similarly solicitous of the latitude delegated to DEP in devising remedies to combat pollution. *See, e.g., In re Kimber Petroleum Corp.,* 110 *N.J.* 69, 74, 539 *A.2d* 1181 (1988) (although DEP practice of requiring payment by responsible parties prior to DEP conduct-

ed cleanup not directly authorized under Spill Act, it was authorized by DEP's implied authority to do what was necessary to enforce Act); *Public Serv. Elec. & Gas Co. v. Department of Envtl. Protection*, 101 *N.J.* 95, 501 *A.*2d 125 (1985) (upholding DEP fee schedule under Water Pollution Control Act); *A.A. Mastrangelo, Inc. v. Department of Envtl. Protection*, 90 *N.J.* 666, 684, 449 *A.*2d 516 (1982) (authority for regulations concerning redirection of waste flow streams promulgated pursuant to Solid Waste Management Act found in incidental powers necessary to effectuate fully Act's legislative purpose); *GATX Terminals Corp. v. Department of Envtl. Protection*, 86 *N.J.* 46, 51–52, 429 *A.*2d 355 (1981) (although Spill Act specifically authorized DEP to provide availability standards only for "procedures, personnel, and equipment," authority for regulations affecting design, construction, and maintenance of facilities found in Act's liberal construction clause and general purpose of spill prevention).

■ The cleanup of hazardous wastes is a complex problem, involving the delicate balance of environmental protection with concerns for the State's economy and public health. As the Legislature has recognized, so complicated a subject calls for the expertise of an administrative agency. *See City of Newark v. Natural Resource Council*, 82 *N.J.* 530, 540, 414 *A.*2d 1304 (1980) (Court relied on administrative expertise in upholding maps drawn by DEP); *GAF Corp. v. Department of Envtl. Protection*, 214 *N.J.Super.* 446, 452–53, 519 *A.*2d 931 (App.Div. 1986) (Court upheld DEP's bioassay methodology to determine fee for pollution discharge permits). The presumed validity of administrative regulations is consistent with our traditional deference to an agency's interpretation of novel legislation, such as ECRA. *See Newark Firemen's Mut. Benevolent Ass'n, supra*, 90 *N.J.* at 55, 447 *A.*2d 130 (Court defers to commission's implementation of Employer–Employee Relations Act because of commission's experience with labor disputes); *In re Freshwater Wetlands Protection Act Rules*, *N.J.A.C. 7:7A–1.1*, 238 *N.J.Super.* 516, 527, 570 *A.*2d 435 (App.Div.1989)

(judicial deference appropriate "when the case involves the construction of a new statute by its implementing agency"). Accordingly, we give due deference to DEP's interpretation of ECRA. *In re Robert L. Mitchell Technical Ctr.*, 223 *N.J.Super.* 166, 173, 538 *A.*2d 410 (App.Div.1988).

-III-

-A-

Cross-appellants contend that the requirement of *N.J.A.C.* 7:26B–1.3 requiring off-site cleanup is contrary to the definitions of both "cleanup plan" and "negative declaration" in *N.J.S.A.* 13:1K–8. They argue that the statute limits cleanup responsibility to toxic substances located on the site of an industrial establishment. We disagree.

The challenged regulation, *N.J.A.C.* 7:26B–1.3, defines "cleanup plan" as "a plan for the cleanup of an industrial establishment and any contamination, including any off-site contamination which has emanated or is emanating from the industrial establishment * * *."

ECRA defines a "cleanup plan" as

a plan for the cleanup of industrial establishments, approved by the department, which may include a description of the locations, types and quantities of hazardous substances and wastes that will remain on the premises; a description of the types and locations of storage vessels, surface impoundments, or secured landfills containing hazardous substances and wastes; recommendations regarding the most practicable method of cleanup; and a cost estimate of the cleanup plan. [*N.J.S.A.* 13:1K–8a.]

According to the statute, a "negative declaration" means

a written declaration, submitted by an industrial establishment and approved by the department, that there has been no discharge of hazardous substances or wastes on the site, or that any such discharge has been cleaned up in accordance with procedures approved by the department, and there remain no hazardous substances or wastes at the site of the industrial establishment. [*N.J.S.A.* 13:1K–8g.]

The statutory language indicates that ECRA is primarily concerned with the cleanup of sites subject to specific transactions. That terminology, however, does not expressly prevent

DEP from extending the statute to off-site wastes emanating from an industrial establishment. As defined, a "cleanup plan" may cover "substances and wastes that will remain on the premises" and may include "recommendations regarding the most practicable method of cleanup." That definition does not exclude off-site wastes. DEP apparently concluded that the most practicable method of cleanup need not stop at the border of the owner's property, but may extend to the waste emanating from that property. We find this interpretation of the statutory language to be both practical and plausible.

Furthermore, the statutory definition of "negative declaration" requires an owner or operator to certify that there remains "no hazardous substances or wastes at the site of the industrial establishment." The definition also requires the owner or operator to assure DEP that there "has been no discharge of hazardous substances or wastes on the site, or that any such discharge has been cleaned up in accordance with procedures approved by the department." The statute does not expressly exempt the off-site migration of wastes from the requirement of filing a negative declaration. Only the initial dumping, spill, or storage must be on site. The most sensible interpretation of the "discharge" of on-site wastes would include migration of those wastes beyond the border of the sites. *See* 33 *U.S.C.A.* § 1362(12) (Clean Water Act defines discharge as addition of any pollutant to navigable waters from any point source); *N.J.S.A.* 58:10–23.11b(h) (Spill Act defines discharge as action or inaction resulting in release of hazardous substance subject to subsequent migration, including from one jurisdiction to another). Hazardous wastes that ooze off site are as much a threat to the environment as wastes that remain on site. We conclude that ECRA's definitions of "cleanup plan" and "negative declaration" are sufficiently broad to extend ECRA's reach to wastes discharged on site that have migrated off site.

From ECRA's inception, moreover, DEP, when reviewing applications, has consistently interpreted the statute to extend liability beyond the property lines of the contaminated site.

This steadfast interpretation supports the conclusion that the regulation reflects a permissible statutory interpretation. *See Aluminum Co. of Am. v. Central Lincoln Peoples' Util. Dist.,* 467 *U.S.* 380, 390, 104 *S.Ct.* 2472, 2479, 81 *L.Ed.*2d 301, 310 (1984) (deference given to Bonneville Power Administration's interpretation of Regional Act due to its expertise and fact that following passage of Act, agency immediately interpreted statute in manner under challenge); *Last Chance Dev. Partnership v. Kean,* 119 *N.J.* 425, 433–34, 575 *A.*2d 427 (1990) (DEP's construction of statute regulating commercial development of waterfront over period of years without legislative interference granted great weight as evidence of conformity with legislative intent); *cf. Rust v. Sullivan,* 500 *U.S.* ——, ——, 111 *S.Ct.* 1759, 1786–88, 114 *L.Ed.*2d 233, 273–75 (1991) (Stevens, J., dissenting) (eighteen-year agency interpretation of Title X of Public Health Service Act as not prohibiting abortion-related speech important in finding current agency rulemaking to the contrary *ultra vires*); *State, Dep't of Envtl. Protection v. Stavola,* 103 *N.J.* 425, 434–36, 511 *A.*2d 622 (1986) (new application of statute held invalid due to longstanding failure of DEP to apply Coastal Area Facility Review Act to cabanas).

DEP's undated eleven-page pamphlet, entitled "A Guide to the Environmental Cleanup Responsibility Act" (Guide), is not to the contrary. Prepared for the owners and operators of affected sites, DEP intended the Guide to be an "easy-to-read document * * * intended to answer most of your questions about the new ECRA program * * *." Accordingly, the Guide answers such questions as "Where can I get a copy of the ECRA regulations?", "What forms do I use?", and "How do I get the Department to send me a letter certifying that my company/property is not subject to ECRA?". The dissent to the contrary notwithstanding, *post* at 466–467, 608 *A.*2d at 300, it cannot be seriously contended that this pamphlet contradicts DEP's consistent interpretation that ECRA covers off-site contamination.

When read in its entirety, ECRA supports the conclusion that it encompasses off-site contamination. In its findings, the

Legislature declared that "the generation, handling, storage and disposal of hazardous substances and wastes pose an inherent danger of exposing the citizens, property and natural resources of this State to substantial risk of harm or degradation." *N.J.S.A.* 13:1K–7. The requirement that owners or operators must clean up wastes that have spread off site is consistent with the legislative goal of protecting against the danger of those risks. To illustrate, DEP informs us that twenty-five percent of ECRA's "high environmental concern" cases involve off-site contamination. According to Assistant Commissioner Miller, a review of current ECRA cases shows that "177 or 25% of DEP's most serious ECRA cases involve off-site contamination, either soil or ground water contamination or both." From its review, DEP concludes that industrial-establishment wastes that leak beyond a site's borders pose a significant threat to groundwater. Including off-site contamination, therefore, is important in the early detection of the contamination of drinking water. As we recognized in *Dixon Venture v. Joseph Dixon Crucible Co.*, 122 *N.J.* 228, 232, 584 *A.*2d 797 (1991), ECRA is designed so that the owner of the property "cannot walk away from the scene after deciding to cease operations." Absent a requirement to account for all wastes that emanate from an industrial establishment, an owner or operator could merely clean up on-site wastes and ignore pollution that has migrated beyond the property's borders.

Any incentive to allow the spread of pollution runs afoul of the Legislature's finding that "the closing of operations and the transfer of real property utilized for generation, handling, storage and disposal of hazardous substances and wastes should be conducted in a rational and orderly way, so as to mitigate potential risks * * *." *N.J.S.A.* 13:1K–7. We recognize that off-site migration is covered by other environmental legislation, such as the Spill Compensation and Control Act. See *N.J.S.A.* 58:10–23.11 (the Spill Act). In the absence of *N.J.A.C.* 7:26B–1.3, however, owners could sell or transfer an industrial establishment without regard to off-site pollution.

Nothing in the statute or its history suggests that the Legislature contemplated so fragmentary a result. Indeed, the legislative intent points in the opposite direction—toward the "rational and orderly" closing or transfer of an industrial establishment. *See Fabritex Mills, supra,* 231 *N.J.Super.* at 230–31, 555 *A.*2d 649 (holding valid DEP interpretation of "cessation of all operations" to include "substantially all operations" as necessary to effectuate legislative purpose of rational and orderly closings).

Cross-appellants correctly state that ECRA places a burden on business transactions. The statute reflects legislative recognition that the cleanup of industrial wastes is costly. It also reflects the legislative judgment to marshall economic forces to achieve that cleanup. *Dixon Venture, supra,* 122 *N.J.* at 231–32, 584 *A.*2d 797. We believe that extending ECRA to off-site wastes does not place a more onerous burden on transactions than the Legislature intended. The clear imposition of the economic .burden on the owners and operators enables them to negotiate with a purchaser the true cost of the sale, including the cost of cleanup. Thus, ECRA fosters rational negotiations under the overarching legislative intent to remove hazardous waste from industrial sites.

By placing the burden of restoration on owners and operators, ECRA not only requires inclusion of the cost of cleanup in an affected transaction, but also avoids the expenditure of public money. Under the Spill Act, the determination of responsibility for the contamination can delay cleanup efforts. *NL Indus., supra,* 216 *N.J.Super.* at 61–62, 522 *A.*2d 1025. Unlike the Spill Act, ECRA is self-executing. *Compare N.J.S.A.* 58:10–23.11f(a) (DEP has discretion to initiate cleanup by removing hazardous substance or by so directing a discharger) *with N.J.S.A.* 13:1K–9 (owner or operator must present negative declaration or cleanup plan on sale, transfer, or closure of industrial establishment). Assistant Commissioner Miller informs us that "[t]he 177 ECRA sites with off-site contamination are almost double the 91 sites that DEP·is currently handling under its publicly funded cleanup program [the Spill

Act, *N.J.S.A.* 58:10–23.11(a) to –23.11(z) ]." By singling out owners and operators, ECRA prevents protracted investigation or litigation to identify the responsible party. *NL Indus., supra,* 216 *N.J.Super.* at 64, 522 *A.*2d 1025; *see In re Vulcan Materials Co.,* 225 *N.J.Super.* 212, 219, 542 *A.*2d 25 (App.Div. 1988) (express exclusion in definition of "industrial establishment" for facilities covered by Solid Waste Management Act read narrowly to apply ECRA to tinning plant built on solid waste landfill).

■ Only when an on-site discharge migrates across the property's borders is the owner obligated to clean up the off-site waste. The definition of "negative declaration" requires an owner of affected property to prove no more than that there has been no "discharge * * * on or from the industrial establishment" or that such discharge has been cleaned up and there remains "no hazardous substances and wastes at the industrial establishment." *N.J.A.C.* 7:26B–1.3. The regulation does not authorize DEP to require owners and operators who have proved the absence of on-site discharges to disprove the migration of wastes to other sites. Hence, the burden of disproving off-site migration of on-site contamination is consistent with the central purposes of the statute. *Dixon Venture, supra,* 122 *N.J.* at 232–34, 584 *A.*2d 797. We trust, moreover, that DEP will act reasonably in discharging its statutory responsibilities and will not needlessly require owners and operators to disprove off-site migration.

ECRA explicitly empowers the DEP to establish certain minimum-toxicity standards to "ensure that the potential for harm to public health and safety is minimized to the maximum extent practicable * * *." *N.J.S.A.* 13:1K–10. The statute further invests DEP with plenary authority to adopt "provisions or procedures necessary to implement this act." Read in light of ECRA's specific provisions, so sweeping a mandate suggests that the Legislature intended to grant DEP the power to enact the challenged regulation. *See A.A. Mastrangelo, Inc., supra,*

90 *N.J.* at 684, 449 *A.*2d 516. In sum, the challenged definition fulfills the legislative mandate for the swift and certain cleanup of toxic wastes.

Our dissenting colleague disagrees with our reading of ECRA. The initial point of difference is that we believe that DEP has correctly discerned that the Legislature intended ECRA to cover off-site pollution. *Supra* at 448, 608 *A.*2d at 291. In contrast, the dissent contends that the Legislature intended to excuse polluters from liability under ECRA for pollution that migrates to adjacent properties. *Post* at 471–472, 608 *A.*2d at 303. Implicit in the dissent is the notion that the Legislature either did not consider the practical consequences of industrial pollution or that it consciously decided to favor polluters over the public. Our review of the language of the entire statute, as well as its background and purpose, leads us to the opposite conclusion.

We also disagree with the dissent's underlying premise that imposing responsibility under ECRA for off-site pollution will thwart cleanup efforts. The dissent speculates that because of the difficulty in ascertaining the source of off-site wastes, owners and operators will frustrate the cleanup of those wastes in "a time consuming and controversial analysis about the source of off-site contamination." *Post* at 473, 608 *A.*2d at 303. That speculation is flawed both conceptually and practically. The conceptual flaw is the dissent's failure to recognize that a polluter cannot free its property for transfer merely by gainsaying responsibility for off-site contamination. Under ECRA, a polluter seeking to sell its property may not delay cleanup by denying its own responsibility or by trying to foist that responsibility on to another. See *supra* at 448, 608 *A.*2d at 290. Confining DEP to determining responsibility for off-site cleanup under the Spill Act or other statutes would allow polluters to dispute the identity of both the property and the entity responsible for generating the contamination. The dissent may disagree with the judgment of the Legislature and DEP that ECRA covers the cleanup of off-site contamination, but it cannot reasonably deny that ECRA provides the most efficient

method of cleaning up those sites. Indeed, cross-appellants seek to avoid their obligations under the statute precisely because ECRA is so effective at cleaning up the environment.

As a practical matter, the dissent fails to appreciate the unavailability of public funds to clean up industrial sites. DEP informs us that the economic reality is that ECRA provides the only means of financing the clean-up of those sites. Our reading of ECRA leads us to conclude, moreover, that the Legislature intended that cleanup costs should be borne by the polluters who imposed those costs, and not by public funds available under other statutes, such as the Spill Act. See *supra* at 456, 608 *A*.2d at 295. So viewed, the dissent is best understood as an apology for an environmental policy different from that contained in ECRA and DEP regulations. Our task, however, is not to create a policy of our own, but to recognize that of the Legislature and DEP.

-B-

■ We now turn to the definition of an industrial establishment, which ECRA describes as

any place of business engaged in operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous substances or wastes on-site, above or below ground, having a Standard Industrial Classification [SIC] number within 22–39 inclusive, 46–49 inclusive, 51 or 76 as designated in the Standard Industrial Classification Manual [SICM] prepared by the Office of Management and Budget in the Executive Office of the President of the United States. [*N.J.S.A.* 13:1K–8f.]

*N.J.A.C.* 7:26B–1.3 further defines "industrial establishment" as including

all of the block(s) and lot(s) upon which the business is conducted and those contiguous block(s) and lot(s) controlled by the same owner or operator that are vacant land, or that are used in conjunction with such business.

The Appellate Division held that DEP properly construed the statutory definition to include contiguous parcels of vacant land controlled by the owner or operator of the enterprise. 250 *N.J.Super.* at 250–51, 593 *A*.2d 1193. We agree.

The statutory language does not restrict the definition of an "industrial establishment" to the productive or plant portion of a business operation. Although contiguous vacant land is not expressly included in "place of business," any reasonable construction of that phrase would include land that has become a repository for hazardous substances generated in conjunction with the operation of a business.

The term "industrial establishment" is based on the SIC Manual to which ECRA refers. *N.J.S.A.* 13:1K–8f. That manual classifies facilities according to the primary activities in which they are engaged and identifies those facilities with specific numbers. ECRA subjects to its provisions only those facilities with numbers indicating that such facilities are likely to generate hazardous wastes. In brief, the Legislature looked to the manual to specify the operations that will trigger responsibility under ECRA. As the Appellate Division noted, the SIC Manual's definition of "industrial establishment" as " 'an economic unit, generally at a single physical location, where business is conducted or services or industrial devices [sic] are performed' " would include contiguous parcels used in conjunction with the establishment. 250 *N.J.Super.* at 251, 593 *A.*2d 1193 (quoting SIC definition). The court observed that "common sense tells us these sites are likely to be threatened by contamination." *Ibid.*

DEP informs us that it has frequently found adjacent land to be a dumping ground for hazardous wastes from an industrial site. That information is consistent with the Appellate Division's observation that it would strain "credulity to imagine that the Legislature believed only the ground occupied by a physical structure would be threatened by such contamination." 250 *N.J.Super.* at 250, 593 *A.*2d 1193; *N.J.A.C.* 7:26B–1.3. So untoward a result would run counter to ECRA's statement of purpose for the cleanup of sites contaminated by hazardous substances. *N.J.S.A.* 13:1K–7.

Furthermore, the Appellate Division has extended the phrase "industrial establishment" to include an auxiliary research facility. See *In re Robert L. Mitchell Technical Ctr., supra*, 223 *N.J.Super.* at 171–73, 538 *A.*2d 410. The court reasoned that because the ancillary operation "may well be handling hazardous substances of the same or similar nature to those handled in [the owner's] primary activity," inclusion of such facilities fell within the Legislature's concern that the "disposal of hazardous substances and wastes should be conducted in a rational and orderly way, so as to mitigate potential risks." *Id.* at 172, 538 *A.*2d 410; *N.J.S.A.* 13:1K–7. That conclusion, like that of the Appellate Division in this case, is consistent with the legislative call for a rational and orderly closure of contaminated property. The exemption of vacant land contiguous to a plant would provide owners with an incentive to move hazardous wastes from the plant site to that land. Such an exemption would allow owners to sell off the uncontaminated part of the property and abandon the part that is contaminated. The result would be the depletion of assets available for cleanup and the exposure of the public to the risks and costs of remediation. That result would be neither rational nor orderly.

Both the Legislature and DEP, moreover, have provided means to avoid a draconian application of ECRA. By permitting an owner or operator to file a negative declaration that the site is uncontaminated, the Legislature has incorporated a safety valve in the statutory scheme. DEP has provided two additional procedures to relieve the pressure on owners and operators. One procedure, known as an administrative consent order (ACO), permits owners and operators to proceed with a sale before fully complying with ECRA. The permission includes situations in which DEP determines that it cannot approve either a cleanup plan or a negative declaration within four months. *N.J.A.C.* 7:26B–7.1(a)3. The ACO procedure permits a business transaction to proceed, while assuring that an owner or operator will not "dump and run" from contaminated property. *Dixon Venture, supra*, 122 *N.J.* at 231–32,

584 *A.*2d 797. DEP advises us that it has executed more than 1,000 such ACOs, thereby allowing the transfer of more than 1,600 facilities.

■ Second, when the sale price of the real property to be conveyed is under twenty percent of the total appraised value of the industrial establishment and the property has never been involved with hazardous wastes, DEP may grant a Certificate of Limited Conveyance. *N.J.A.C.* 7:26B–13.1. The certificate allows the transaction to proceed before a complete ECRA review of the entire facility. If a parcel of contiguous vacant land is uncontaminated and constitutes only a small part of the entire property, transfer of that parcel will not trigger ECRA responsibilities. We agree with the Appellate Division that "DEP's decision to require review of an entire site when real property comprising more than 20% of the total value of the industrial property is conveyed is in accord with the purpose of ECRA and a reasonable exercise of its discretion to issue regulations implementing broad statutory language." 250 *N.J.Super.* at 247, 593 *A.*2d 1193. The limited conveyance rule balances the interests of owners in selling portions of industrial facilities with the interests of the public in knowing that such properties are free from contamination.

The judgment of the Appellate Division is affirmed in part and reversed in part.

GARIBALDI, J., concurring in part, and dissenting in part.

The issue is not whether the New Jersey Department of Environmental Protection ("DEP") or this Court believe that to expand a property-owner's liability to include off-site contamination is good policy. The issue is whether the Legislature, in enacting the Environmental Cleanup Responsibility Act, *N.J.S.A.* 13:1K–6 to –13 ("ECRA" or "Act"), intended and authorized such extensive liability. I conclude that by imposing liability on the property-owner for off-site contaminated property, the DEP has substantially expanded its authority under the

Act. Such a sweeping change must be made by the Legislature, not an administrative agency.

Everyone recognizes that a clean environment is best for the public health and for the economy. The question is how that goal can most efficiently be reached in view of limited private and public resources and the need for communities, particularly the urban areas in this state, to be economically viable. That issue is best addressed by the Legislature. The Legislature can seek advice from and synthesize the views of all interested parties, including the DEP, the New Jersey Department of Commerce and Economic Development, the business community, labor unions, environmentalists, and leaders of urban communities, all of whom have a vital stake in a sound environment and a sound economy.

I agree with the Appellate Division's determination that the DEP exceeded its statutory authority under ECRA by promulgating *N.J.A.C.* 7:26B–1.3 (Regulation 1.3), the regulation that defines a "cleanup plan" as a plan addressing off-site as well as on-site contamination. See 250 *N.J.Super.* 189, 243–46, 593 *A.2d* 1193 (1991). In reversing the Appellate Division, the majority ignores the Act's plain language and circumvents the legislative intent behind the Act. The Court's ruling contravenes the Legislature's intent because it will generate litigation delaying cleanup and will chill the real-estate transactions designed to trigger the cleanup requirement. As a result, more rather than fewer sites will remain contaminated. Meanwhile, the State and its communities will be deprived of the economic benefits of a healthy real-estate market.

I

"Construction of any statute necessarily begins with consideration of its plain language." *Merin v. Maglaki,* 126 *N.J.* 430, 434, 599 *A.2d* 1256 (1992); *Kimmelman v. Henkels & McCoy,* 108 *N.J.* 123, 128, 527 *A.2d* 1368 (1987). Such language should be given its "ordinary and well understood meaning." *Levin v.*

*Township of Parsippany–Troy Hills,* 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980). Moreover, "[t]he words chosen by the legislature are deemed to have been chosen for a reason." *Merin v. Maglaki, supra,* 126 *N.J.* at 435, 599 *A.*2d 1256.

The statutory language is clear and unambiguous. Regulation 1.3 elaborates on the statutory definition of "cleanup plan" established by § 13:1K–8a, which states:

> "Cleanup plan" means a plan for the cleanup of *industrial establishments,* approved by the department, which may include a description of the locations, types and quantities of hazardous substances and wastes *that will remain on the premises;* a description of the types and locations of storage vessels, surface impoundments, or secured landfills containing hazardous substances and wastes; recommendations regarding the most practicable method of cleanup; and a cost estimate of the cleanup plan. [Emphasis added.]

"Industrial establishment" is defined in the Act to mean a *"place of business engaged in operations * * ** having a Standard Industrial Classification number * * *." *N.J.S.A.* § 13:1K–8f (emphasis added). The Legislature's definition of an "industrial establishment" is based on the Standard Industrial Classification Manual ("SIC") prepared by the Office of Management and Budget of the United States. As the Appellate Division notes, the Manual defines an "industrial establishment" as " 'an economic unit, generally at a single physical location, where business is conducted or where services or industrial devices [sic] are performed.' " 250 *N.J.Super.* at 251, 593 *A.*2d 1193 (quoting appellant's brief citing SIC Manual). When read together, the Act's definitions of "cleanup plan" and "industrial establishment" demonstrate that the cleanup plan required by ECRA covers only the physical location where the industrial establishment conducts its business or where its services or operations are performed. They do not encompass off-site properties.

Other provisions of ECRA verify that the cleanup plan required by the statute covers only the on-site property that is being closed, sold, or transferred, and that it was not intended to address off-site contamination.

*N.J.S.A.* § 13:1K–9c, which directs the owner or operator of an industrial establishment to implement a cleanup plan, states:

> The cleanup plan and detoxification of *the site* shall be implemented by the owner or operator, provided that the purchaser, transferee, mortgagee or other party to the transfer may assume that responsibility pursuant to the provisions of this act. [Emphasis added.]

Although the Legislature could have referred to the cleanup of the contamination, it explicitly referred to the cleanup of the *site.* Similarly, *N.J.S.A.* § 13:1K–10, which authorizes the DEP to establish detoxification standards for the review of cleanup plans, specifically refers to their application to the "site of an industrial establishment" and not to the contamination generally. *Ibid.*

*N.J.S.A.* 13:1K–8g defines a "negative declaration" as

> * * * a written declaration, submitted by an industrial establishment and approved by the department, that there has been no discharge of hazardous substances or wastes *on the site,* or that any such discharge has been cleaned up in accordance with procedures approved by the department, and there remain no hazardous substances or wastes *at the site of the industrial establishment.* [Emphasis added.]

The majority interprets the definition of a "negative declaration" to require the absence of off-site as well as on-site contamination. The majority, however, fails to reconcile that interpretation with the last sentence of the definition as quoted above, which specifically refers to the absence of "hazardous substances or wastes at the site of the industrial establishment."

In sum, the Act speaks solely of on-site property; nowhere does the Act speak of "off-site" property or otherwise extend liability to the premises or property of an industrial establishment that is not being closed, sold, or transferred. As the Appellate Division determined, both statutory provisions defining "cleanup plan" and "negative declaration" expressly "focus on the conditions of the industrial site itself, not discharges off-site." 250 *N.J.Super.* at 244, 593 *A.*2d 1193. Had the Legislature intended to expand the Act to include off-site property, it would have drafted the statute accordingly. It did not.

The majority declares that we should give deference to the DEP's interpretation of the statute that it is obliged to enforce, *ante* at 449–451, 608 *A*.2d at 291–292, and that the DEP has consistently interpreted the statute to extend liability off-site. *Ante* at 453–454, 608 *A*.2d at 293–294. Interestingly, the majority's assertion notwithstanding, the DEP has not consistently interpreted ECRA to extend liability to off-site property. Indeed, DEP's initial position was to the contrary. In its 1984 *Guide to the Environmental Cleanup Responsibility Act* ("Guide"), DEP provided:

> ECRA attempts to place that cleanup responsibility where it belongs by requiring Industrial Establishments to clean up *their facilities* as a precondition to closure, sale or transfer of their operations. [*Guide* at 1 (emphasis added).]

The *Guide* further states:

> *Cleanup Plan*
>
> A Cleanup Plan is a proposal developed by the owner or operator of the Industrial Establishment that describes in detail the method and operations that will be used to return the *site* to an environmentally acceptable condition. [*Guide* at 6 (emphasis added).]

Moreover, DEP chose to compare the ECRA program to Home Buyer Protection Programs instituted by many municipalities. *Guide* at 1. Those programs require inspections of homes offered for sale. Such inspections are limited to the premises. Hence, at least in 1984, DEP interpreted ECRA to impose liability solely for cleaning up the property being closed, sold, or transferred and not for the contamination of off-site property.

Even if DEP had consistently extended liability to off-site property, deference to the agency's interpretation cannot be stretched to condone DEP's exercise of unauthorized power. Although ECRA is a remedial statute and should be liberally construed, there are limits to liberality. We have held that "[a]n administrative agency may not under the guise of interpretation extend a statute to include persons not intended, nor may it give the statute any greater effect than its language allows." *Kingsley v. Hawthorne Fabrics*, 41 *N.J.* 521, 528, 197 *A*.2d 673 (1964). Accordingly, we have repeatedly held that

" 'administrative regulations * * * will fall if a court finds that the rule is inconsistent with the statute it purports to interpret * * *.' " *Last Chance Dev. Partnership v. Kean,* 119 *N.J.* 425, 432–433, 575 *A.*2d 427 (1990) (quoting *Smith v. Director, Div. of Taxation,* 108 *N.J.* 19, 26, 527 *A.*2d 843 (1987), in turn citing *Airwork Serv. Div. v. Director, Div. of Taxation,* 97 *N.J.* 290, 296, 478 *A.*2d 729 (1984)). This is not a case in which an agency is seeking incidental powers reasonably necessary to effectuate its specific delegation. DEP is seeking far-reaching substantive authority not given in the statute that will have a profound effect on the people of New Jersey, particularly those who live in urban areas.

Despite the deference normally given to agency regulations, this case does not mark the first time that our courts have criticized DEP for expanding its authority beyond the express terms of a statute. As the Appellate Division noted, Regulation 1.3's extension of authority is "analogous to the regulation invalidated in *Matter of Freshwater Wetlands Rules * * *.*" 250 *N.J.Super.* at 245, 570 *A.*2d 435. In *In re Freshwater Wetlands Rules,* the court found that DEP's imposition of a time limit on a statutory exemption went beyond the power accorded by the Freshwater Wetlands Protection Act, *N.J.S.A.* 13:9B–1 to –30, which did not incorporate a time limit. 238 *N.J.Super.* 516, 527–30, 570 *A.*2d 435 (App.Div.1989). *See also Last Chance Dev. Partnership v. Kean, supra,* 119 *N.J.* 425, 575 *A.*2d 427 (1990) (holding that DEP regulations extending geographic reach of DEP's jurisdiction were inconsistent with Waterfront Development Act, *N.J.S.A.* 12:15–1 to –11).

The majority argues that the expertise of an administrative agency is necessary to resolve "the delicate balance of environmental protection with concerns for the State's economy and public health." *Ante* at 451, 608 *A.*2d at 292. On the contrary, that balance involves a political, not a technical, determination, and is thus better left to the Legislature. In writing ECRA, the Legislature established what it considered the optimal balance. DEP's regulation shifts that balance. In this instance,

in which DEP's regulation expands the plain language of the statute, the Court should not be bound to that misconceived interpretation out of an undue deference to the administrative agency.

## II

I believe that the DEP regulation is inconsistent not only with the plain language of the statute but with the indicia of the Legislature's intent in enacting it. The majority justifies its departure from the plain meaning of the statute by stating that it is bridging "the apparent gap between the Legislative intent and the expression of that intent in the statute." *Ante* at 448, 608 *A*.2d at 291. I perceive no such gap. The majority has created the gap through a misconception of the Legislature's intent.

First, in enacting ECRA the Senate used language that limited cleanup liability to on-site property. The *Senate Energy and Environment Committee Statement* that accompanied the successful bill states that the Bill

> imposes a precondition on the closure, sale or transfer of certain properties associated with the manufacture, refining, transportation, treatment, storage, handling, or disposing of hazardous substances or wastes. The precondition is the execution of an approved cleanup plan which details the measures necessary to detoxify *the property*, or the approval by the Department of Environmental Protection of a declaration that there has been no discharge of hazardous substances or wastes *on the property* or that any such discharge has been cleaned up in accordance with procedures approved by the department and there remain no hazardous substances or wastes *on the property*. [*Senate Energy and Environment Committee Statement*, Assembly Bill No. 1231, *L.* 1983, *c.* 330 (June 23, 1983) (emphasis added).]

That the Legislature did not intend ECRA to apply to off-site contamination is also indicated by the fate of subsequent legislation specifically designed to impose off-site liability. On September 10, 1987, Senator Orechio, the President *pro tempore* of the Senate, introduced Senate Bill No. 3625, which proposed amending ECRA to provide that

> "Cleanup plan" means a plan for the cleanup of industrial establishments *and, where necessary, land affected by hazardous waste or hazardous substances originating at industrial establishments,* approved by the department, which may include a description of the locations, types and quantities of hazardous substances and wastes that will remain on the premises; *a description and*

*evaluation of any hazardous substances or hazardous waste on land off the premises of the industrial establishment which originated at the industrial establishment;* * * *. [Senate Bill No. 3625 (1987) (emphasis denotes proposed amendment).]

Senator Orechio thus thought the passage of new legislation was necessary to give the DEP the power it now asserts under the original ECRA. The Senate failed to act on the bill. Although I recognize that the introduction of the bill and the Senate's failure to act on it are not dispositive of legislative intent, the events undisputably demonstrate that at a minimum the President of the Senate, who was also President at the time ECRA was enacted in 1983, did not believe that the original ECRA had given DEP the authority to require the cleanup of off-site property.

In ascertaining the Legislature's intent "we consider not only the particular statute in question, but also the entire legislative scheme of which it is a part." *Kimmelman, supra,* 108 *N.J.* at 129, 527 *A.*2d 1368. In construing legislation "every effort should be made to harmonize the law relating to the same subject matter." *Superior Air Prods. Co. v. NL Indus.,* 216 *N.J.Super.* 46, 63–64, 522 *A.*2d 1025 (App.Div.1987). By noting the state of hazardous-waste regulation at the time ECRA was passed, and the contrasts between it and other hazardous-waste statutes, we can discern the role the Legislature intended ECRA to fulfill.

Prior to ECRA's enactment in 1983, the primary New Jersey law governing hazardous-waste cleanup was the New Jersey Spill Compensation and Control Act ("Spill Act"), *N.J.S.A.* 58:10–23.11 to –23.11(*o*). Once DEP becomes aware of contamination, the Spill Act gives DEP the authority to order a discharger of hazardous substances to remove that discharge. *N.J.S.A.* § 58:10–23.11f(a). DEP may also choose to undertake cleanup itself, using the limited resources in the New Jersey Spill Compensation Fund. *N.J.S.A.* 58:10–23. However, "[a]ny person who has discharged a hazardous substance or is in any way responsible for any hazardous substance" being cleaned up

by DEP is liable for the cleanup and removal costs expended by DEP.

Because only actual dischargers can be required to clean up and DEP can recover its costs only from those responsible for a discharge, the Spill Act is fundamentally fault-based. Because ascertaining who is at fault in causing the discharge is often extremely difficult, there has been much litigation under the Spill Act resulting in costly delays that impede the clean-up of contaminated property. As the majority also notes, *ante* at 446–447, 608 *A.*2d at 290, the Legislature passed ECRA to avoid the delays occasioned by the Spill Act's fault-based liability and to establish an additional trigger for hazardous-waste cleanup.

ECRA imposes liability regardless of the property-owner's responsibility for the contamination in order to avoid the litigation that had previously delayed the initiation of cleanup. As the Appellate Division stated in *Superior Air Prods. v. N.L. Industries, supra,* 216 *N.J.Super.* at 63, 522 *A.*2d 1025,

> it is clear that ECRA was intended to avoid the delay in perfecting cleanup inherent in the determination of liability through litigation. Responsibility for the contamination plays no part in the ECRA process.

The "simple aim of ECRA is swift and thorough cleanup through a regulatory process." *Id.* at 65, 522 *A.*2d 1025. ECRA should thus be interpreted to preserve the legislative goal of minimizing delays in initiating cleanup. As will be discussed further in Part III, Regulation 1.3 will create the types of time-consuming disputes over responsibility for off-site contamination that the Legislature sought to avoid.

The Legislature also designed ECRA to provide an additional means for discovering contamination and triggering cleanup. As the Court recently stated in *Dixon Venture v. Joseph Dixon Crucible,* 122 *N.J.* 228, 231–32, 584 *A.*2d 797 (1991), "ECRA is quite unlike other environmental regimes in that it uses market forces to bring about the reversal of environmental pollution." In contrast, DEP must be aware of the contamination before cleanup occurs under the Spill Act. ECRA prompts the discovery and amelioration of contamination by requiring investi-

gation and cleanup as a precondition to a property transaction. The Legislature intended the owner's desire to sell its property to act as the catalyst for cleanup. The sale gives the owner not only the incentive to sell but the financial resources to be able to conduct the cleanup. The Legislature could not have intended an interpretation of ECRA that unnecessarily discourages the market transactions that trigger the sought-after cleanup. As will be discussed further in Part III, Regulation 1.3 will discourage market transactions.

The majority supports its ruling by painting a dire picture of environmental disaster if DEP does not have the authority under ECRA to compel a property owner to clean up off-site contamination. *Ante* at 455–456, 608 *A.*2d at 294–295. It implies that legislative intent will be frustrated if all actions necessary to avert that disaster are not permissible under ECRA. Although the Legislature recognized the danger to the public of hazardous substances and wastes in enacting ECRA, *N.J.S.A.* 13:1K–7, that does not mean that the Legislature intended any action addressing that danger to be justified under the Act. The Legislature intended ECRA to supplement, not replace, the other forms of statutory authority available to achieve cleanup.

DEP has a formidable arsenal of environmental statutes providing the requisite authority. As the Appellate Division properly observed, "a property owner can be compelled under the Spill Act to remedy any discharge onto land which threatens the natural resources of the State." 250 *N.J.Super.* at 245, 593 *A.*2d 1193 (citing *Summit Assocs. v. Liberty Mut. Fire Ins. Co.*, 229 *N.J.Super.* 56, 65, 550 *A.*2d 1235 (App.Div.1988)). When DEP deems it necessary, it can also use its own resources to clean up environmental hazards. *N.J.S.A.* § 58:10–23.11f(a). Other statutes provide additional authority for responding to specific forms of hazardous discharges. See Water Pollution Control Act, *N.J.S.A.* § 58:10A–10 (when discharger violates Water Pollution Control Act or permit issued thereunder, Commissioner of Environmental Protection can, *inter alia,* seek injunctive relief and recover costs expended on remediat-

ing effects of discharge); Safe Drinking Water Act, *N.J.S.A.* § 58:12A–10 (when facility violates Safe Drinking Water Act, DEP can sue for injunction); Solid Waste Management Act, *N.J.S.A.* § 13:1E–9 (when facility violates Solid Waste Management Act, Commissioner of Environmental Protection can, *inter alia,* seek injunctive relief and recover costs expended on remediating the effects of noncompliance).

When the ECRA process has alerted DEP to off-site as well as on-site contamination, DEP can address that off-site contamination under other relevant statutes without impeding the transaction triggering ECRA. The Legislature intended the State's environmental statutes to complement one another. It certainly would not have wanted ECRA's goals of speedier cleanups triggered by frequent market transactions to be undermined when alternative means for remedying environmental threats exist.

### III

The majority's interpretation of Regulation 1.3 does not take into account the practical effects of its application. An analysis of those effects makes apparent the regulation's inconsistency with legislative intent.

The requirement that a property owner clean up off-site contamination traceable to on-site discharges sounds so straightforward—just follow the discharge from on-site to off-site. However, the source of pollution is often both extremely difficult and extremely expensive to ascertain. Contamination from the discharge of hazardous substances can migrate off-site through the soil, air, surface water, or groundwater. Particularly in highly-urbanized areas, once hazardous wastes have migrated from the original discharge they are likely to mingle with contamination stemming from other industrial facilities. The adjacent property may be used in activities that are equally or even more environmentally dangerous than those engaged in by the proposed seller.

Faced with Regulation 1.3's requirement to clean up off-site contamination, the seller will contest what proportion of the off-site pollution stems from the original discharge on its property, and will understandably resist cleaning up any contamination associated with discharges that do not emanate from its site. Regulation 1.3 thus converts ECRA's quick and simple determination of liability into a time-consuming and controversial analysis about the source of off-site contamination. The result is litigation over fault and its consequent delays—the very evils ECRA was designed to prevent.

Implementation of the regulation will result not only in delayed cleanups. It will also discourage property transactions altogether, thus undermining ECRA's triggering mechanism. The delay forces sellers and purchasers to operate under uncertainty for a considerable period of time. Sellers will be deterred from selling because of the potential liability at stake, while purchasers will be deterred from seeking new property by the potentially-significant delays and uncertainties associated with the transaction.

Businesses need predictability and certainty concerning cost and timing. They do not want to wait for years to know the cost or time when they can occupy the property. A purchaser will be willing to undertake the transaction only when it desperately needs or wants the site. I suspect that in most cases the purchaser will look for other property.

If the cleanup is limited to on-site property, property owners will be more willing to transfer and clean up their properties. ECRA will produce clean sites achieved with a minimum of delay. Even if the discharge has leaked off-site, at least one source of the contamination will have been extinguished. If the sale of property is discouraged, neither of these beneficial effects will occur. Instead, both the on- and off-site property will continue to be polluted, the property owner will be unable to sell its property, and the cities will be deprived of new businesses. As a consequence, no cleanup will have occurred,

inefficient businesses will continue in operation, and the potential for new jobs will have been lost without any commensurate environmental benefit.

Regulation 1.3's expansion of liability raises all the delay and cost problems inherent in fault statutes. Those are the problems that the Legislature perceived and the problems that ECRA with its no-fault approach was designed and enacted to avoid. Such an expansion of liability is best left to the Legislature and not to an administrative agency.

## IV

I concur in the majority's affirmance of the Appellate Division's decision upholding *N.J.A.C.* 7:26B–1.3. Indeed, the definition of "industrial establishment" in *N.J.S.A.* 13:1K–8f offers further support that the Legislature intended to limit cleanup plan to the on-site property of an industrial establishment and did not intend to extend it to property not owned or used by such industrial establishment.

Justice Stein joins in this dissent.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices POLLOCK, CLIFFORD and O'HERN—4.

*For affirmance*—Justices GARIBALDI and STEIN—2.