231 N.J. Super. 224 (1989)
555 A.2d 649
IN THE MATTER OF FABRITEX MILLS, INC.
Superior Court of New Jersey, Appellate Division.
Submitted November 29, 1988.
Decided February 17, 1989.
*225 Before Judges DREIER and BROCHIN.
Budd, Larner, Gross, Picillo, Rosenbaum, Greenberg & Sade, attorneys for appellant (Kathleen C. Marchetti, on the brief).
Cary Edwards, Attorney General of New Jersey, attorney for respondent (Michael R. Clancy, Deputy Attorney General, of counsel; Dale Laster Lessne, Deputy Attorney General, on the brief).
The opinion of the court was delivered by BROCHIN, J.S.C. (temporarily assigned).
*226 Fabritex Mills, Inc. appeals from a final administrative determination of the New Jersey Department of Environmental Protection requiring it to comply with the notice and reporting provisions of the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 and following.
In five buildings rented from Cleaveland Industrial Center, Fabritex operated a facility for the custom coating of fabric with plastic and for the wholesale distribution of its products. Manufacturing facilities of other tenants of Cleaveland were located in adjacent buildings.
On March 7, an employee of the DEP visited a nearby building which had been vacated by a former tenant of Cleaveland. He made this brief, handwritten report of his observations about Fabritex:
TK informed me of a neighboring tenant, Fabritex which ceased operations & left about 100 drums on site. About 50-70 of these drums were on site when I was there. An effort was made to scrub labels off of drums, but "DIOCTYL PHTHALATE" was on them. Fabritex used one lg. bldg., 3 md. bldgs. & 1 sm. bldg. to coat fabric.... refer Fabritex to compliance.... 1st step get RA for Fabritex, ck N.J. Directory, get out letter notifying that cessation = 15/30 day.
On the basis of that report the DEP sent Fabritex a letter dated August 5, 1987, which stated:
This office ... has been advised that Fabritex Mills, Inc. has ceased operations at 20 Parker Road, Long Valley, Morris County. The cessation of operations without submitting the initial ECRA Notice required by N.J.S.A. 7:1-3.7 and without receiving the required Departmental approval either for a Negative Declaration or a Cleanup Plan was in violation of the Act.
The letter enclosed a copy of the administrative regulations referred to in the letter, and required the return of a "General Information Submission" form within five days and a "Site Evaluation Submission" form within fifteen days.
The response was an August 31, 1987, letter from the attorneys for Fabritex enclosing an affidavit from John Logan, who described himself as an "officer" of the corporation. The affidavit stated:

*227 In approximately March of 1986, Fabritex ceased manufacturing operations at the site; however, it presently utilizes the site as a storage facility for the materials utilized in the manufacturing operation.... For the last few months, the corporation has been assessing whether or not it should continue to engage in the manufacturing operations in New Jersey, but has not made any determination that it will permanently cease all operations ... in New Jersey.
The report of the DEP employee and the portion of the affidavit of the officer of Fabritex which we have quoted constitute the entire factual record in the case. The DEP wrote a letter dated October 27, 1987, which stated that "on the basis of the information represented in the affidavit signed by John Logan, the Department finds that this transaction is subject to the provisions of ECRA." Fabritex's attorneys replied that DEP had not answered the question whether "a facility, which had ceased manufacturing operations but continued a storage facility for hazardous substances, was subject to the statute." DEP's final determination, from which this appeal is taken, was its letter of November 19, 1987. The decision was stated as follows:
It was apparent from the affidavit submitted that manufacturing operations had ceased at the site while storage on site remained. The Department's opinion in this situation is that the cessation of manufacturing operations is an ECRA trigger although other operations on site remain active.
The dispute between the parties depends upon a construction of the New Jersey Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 and following. In In re Robert L. Mitchell Tech. Ctr., 223 N.J. Super. 166, 168 (App.Div.), certif. den. 111 N.J. 605 (1988), we briefly described the origin and function of that statute as follows:
In 1983 the Legislature enacted ECRA and thereby held owners or operators of industrial establishments accountable for environmental problems on their properties. It accomplished that goal by requiring that the property be in an environmentally appropriate condition as a precondition to its closure, sale or transfer. The precondition can be met by a negative declaration that no contamination by hazardous substances exists on the property or by a cleanup plan which will detoxify it.
See Farer, "ECRA Verdict: The Successes and Failure of the Premiere Transaction-Triggered Environmental Law", 5 Pace Env.L.Rev. 113 (1987); Schmidt, Jr., "New Jersey's Experience *228 implementing the Environmental Cleanup Responsibility Act, 38 Rutgers L.Rev. 729 (1986).
The statutory provision which is at issue here is the definition of the phrase, "closing, terminating or transferring operations", N.J.S.A. 13:1K-8b. The DEP asserts, and Fabritex denies, that one of those triggering events has occurred and that the company is therefore obligated, pursuant to N.J.S.A. 13:1K-9, to submit and implement an approved cleanup plan for its property. The cited definitional section reads as follows:
b. "Closing, terminating or transferring operations" means the cessation of all operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling or disposal of hazardous substances and wastes, or any temporary cessation for a period of not less than two years, or any other transaction or proceeding through which an industrial establishment becomes nonoperational for health or safety reasons or undergoes change in ownership, except for corporate reorganization not substantially affecting the ownership of the industrial establishment, including but not limited to sale of stock in the form of a statutory merger or consolidation, sale of the controlling share of the assets, the conveyance of the real property, dissolution of corporate identity, financial reorganization and initiation of bankruptcy proceedings. [N.J.S.A. 13:1K-8b]
Fabritex claims that there has been no "closing, terminating or transferring operations" because the facility, although no longer employed for manufacturing, is still being used for storage of hazardous substances which it formerly used in its manufacturing business. The DEP argues that the statutory phrase "cessation of all operations which involve the ... manufacture ... [or] storage ... of hazardous substances and wastes ... [emphasis added]" means the cessation of substantially all such operations. It also points out that N.J.S.A. 13:1K-8b lists operations disjunctively; i.e., "manufacture ... storage ... or disposal of hazardous substances...." and it asserts that therefore the termination of "all manufacturing" constitutes "terminating ... operations" within the meaning of the statute, even if "storage" continues.
The DEP's interim administrative regulations, which were adopted in March 1986 and were in effect when Fabritex received its notice to comply, mirrored the language of the *229 statute and therefore do not aid in its interpretation, but to buttress its construction of the statute, the agency points to its current ECRA Rules, N.J.A.C. 7:26B-1.2, which became effective December 31, 1987. These regulations explicitly define "closing, terminating or transferring operations" to include "the cessation of all or substantially all the operations for a period of not less than two years [emphasis added]." "Cessation of substantially all operations" is defined as having occurred when the number of employees, area of operations or quantity of output has been reduced by at least ninety percent. N.J.A.C. 7:26B-1.5(b).
Apparently Fabritex does not dispute that it has experienced a reduction in the number of its employees, area of operations, or output such that if the current regulations are valid and applicable, it is required to comply with the reporting and implementation provisions of the act. The DEP argues that even though these regulations did not become effective until after Fabritex was notified to comply, the company is bound by regulations in effect at the time of our decision. Fabritex disagrees and also argues that the current regulations are not authorized by the statute.
Statutory language such as that at issue here, i.e., "cessation of all operations", must be construed sensibly to achieve the legislative purpose. See e.g. N.J. Builders, Owners and Managers Association v. Blair, 60 N.J. 330, 338-340 (1972). The legislative purpose for ECRA is expressed in N.J.S.A. 13:1K-7, which states a legislative finding:
.... that the generation, handling, storage and disposal of hazardous substances and wastes pose an inherent danger of exposing the citizens, property and natural resources of this State to substantial risk of harm or degradation; that the closing of operations and the transfer of real property utilized for the generation, handling, storage and disposal of hazardous substances and wastes should be conducted in a rational and orderly way, so as to mitigate potential risks; and that it is necessary to impose a precondition on any closure or transfer of these operations by requiring the adequate preparation and implementation of acceptable cleanup procedures therefor.
*230 In the light of that finding, the statute should not be construed so that a company whose manufacturing and distribution business involves the generation and temporary storage of hazardous substances can avoid an otherwise applicable obligation of submitting and implementing a cleanup plan by leaving some barrels of such substances behind in its premises. That would not effectuate the legislative purpose of assuring that "the closing of operations ... of real property utilized for the generation, handling [and] storage of hazardous substances and wastes" will be "conducted in a rational and orderly way, so as to mitigate potential risks." As least in some cases, such an interpretation of the statute would encourage irrational and disorderly conduct, i.e., leaving hazardous wastes and other substances behind unattended in order to escape or postpone the frequently onerous costs of cleanup incident to termination of operations. Consequently, we agree with the DEP that "all" should not be read literally to mean that until every last barrel of hazardous substances is first removed "storage" continues and the statutory obligations incident to termination of operations are therefore not applicable.
On the other hand, the interpretation of the statute advocated by the DEP, predicated on the disjunctive listing of various types of operations, is subject to the same sort of objection against interpreting a statute so literally that its purpose is defeated. For example, if a company transferred "all operations which involve ... storage ... of hazardous substances" off site, but continued or expanded its handling and manufacturing operations involving such substances, that would not seem a rational reason to invoke the notice and implementation provisions of ECRA, particularly if the "storage" was a minor incident of its business. Consequently, the "cessation" of a minor operation of a type listed in N.J.S.A. 13:1K-8b, while the business conducted on the premises continues to have substantially the same character and magnitude as it had previously, would not, by itself, obligate the occupant to submit and implement a cleanup plan.
*231 In this case, however, the operations of Fabritex have not continued with substantially their former character and volume. The DEP points out that Fabritex previously occupied five buildings for its operations. It functioned as a manufacturer which stored materials as an incident of its fabric coating business. Now all that remains, according to the DEP report, are approximately 100 drums of materials. The report's reference to "an effort ... made to scrub labels off of drums", suggests an abandonment of the drums and perhaps an attempt to conceal the nature of their contents to avoid responsibility for disposing of their contents.
First of all, we hold that the condition described by the report does not amount to a continuation of "storage." "Storage" of hazardous materials necessarily implies their active care and management to protect the materials themselves, the buildings in which they are housed, persons who may come into contact with them, and the environment generally from harm. Leaving the materials in drums, unguarded, in space which was evidently unlocked, with the labels of the barrels having been scrubbed off, is not "storage" within the meaning of the statute. Therefore, we uphold the determination of the DEP on the ground that the facts of the case do not support Fabritex's contention that because "storage" has continued, there has not been a "closing, terminating or transferring [of] operations" within the meaning of N.J.S.A. 13:1K-8b.
Secondly, we hold that the statutory phrase, "cessation of all operations", means the cessation of substantially all operations. Although the DEP's fact finding is sparse, the undisputed facts establish that the termination of manufacturing and distribution at the New Jersey premises of Fabritex constitute a "closing, terminating or transferring [of substantially all of its] operations" within the meaning of the statute thus interpreted.
*232 In view of our holding, there is no need for us to decide the validity and application to this case of the DEP's current ECRA regulations.
AFFIRMED.