NEW WEST URBAN RENEWAL
CO., Plaintiff,

v.

WESTINGHOUSE ELECTRIC
CORP., Defendant.

Civ. No. 94–1033 (WHW).

United States District Court,
D. New Jersey.

Nov. 21, 1995.

Dennis M. Toft, Thomas W. Sabino, Wolff & Samson, Roseland, New Jersey, for Plaintiff, New West Urban Development Co.

Mark D. Shepard, Anne E. Mulgrave, Babst, Calland, Clements & Zomnir, Pittsburgh, Pennsylvania, for Defendant, Westinghouse Electric Corp.

## AMENDED OPINION

WALLS, District Judge.

Plaintiff New West Urban Renewal Co. ("New West") and defendant Westinghouse Electric Corporation ("Westinghouse") have submitted cross-motions for summary judgment and partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Pursuant to a Case Management Order issued by the Magistrate Judge, this motion presents two issues, referred to as: "The Contract Issue" and the "ECRA Issue." For reasons stated below, the Court grants partial summary judgment to New West on the "Contract Issue," and partial summary judgment to Westinghouse on the "ECRA Issue." The respective motions of their adversaries are denied.

### Background

This lawsuit was brought by New West, the buyer of a parcel of land improved with a building against Westinghouse, its seller. This litigation is New West's effort to impose the cost of making that property environmentally sound on Westinghouse. Obviously, the parties have characterized the facts underlying this conflict in a completely divergent manner.

According to New West, this case is about a prosperous company-Westinghouse-which conducted an industrial operation on a site for nearly a century, and polluted that site, and which now seeks to escape through subterfuge from governmentally-imposed duties to remedy the situation.

Westinghouse sees the situation differently. According to it, New West is a sophisticated operation which has made great profits by buying urban properties cheaply and then converting the sites into more profitable holdings. Here, it bought Westinghouse's

former site at a bargain and then determined that the economic prospects were not as rosy as anticipated. Westinghouse claims that this lawsuit was brought by New West to buy its way out of an improvidently entered deal.

New West's First Amended Complaint was filed on March 8, 1995. Essentially, it alleges the following: On December 29, 1983, Westinghouse sold to New West a lot of real property situated at Orange and High Streets in Newark, New Jersey ("the Property"), with a 500,000 square foot building on it. Westinghouse had used the Property from the 1880's until its 1993 conveyance as a manufacturing facility. Additionally, after New West received title to the Property, Westinghouse maintained its occupancy therein for one year, pursuant to a lease agreement dated December 29, 1983. During the period when Westinghouse owned and then leased the Property, it utilized various hazardous substances. These substances were discharged and released into the soils and buildings at the Property. Westinghouse also kept hazardous materials in underground storage tanks ("UST's"), which also were released into the soils and buildings.

### The Contract for Sale

New West and Westinghouse entered into an Agreement of Sale on July 25, 1983. Section 5 of the Agreement, titled *"Deed"* states that,

Seller, at closing, shall execute and deliver a special warranty deed in recordable form, to Purchaser conveying title to the Property in fee simple title, free and clear of all liens and encumbrances except the following:

(a) Zoning, planning subdivision, *environmental or ecological controls*, sanitary, health and building laws, *codes, ordinances, regulations, rules, requirements and restrictions imposed by any governmental authority or otherwise affecting the Property. Seller represents and warrants that it will use its best efforts to provide that there will be no violations existing as of the date of closing of the aforementioned laws, codes, ordinances, regulations, rules,* *requirements or restrictions.* If there are any such violations, Purchaser shall give Seller notice thereof, and thirty (30) days to cure them. If Seller is unable to cure within said thirty (30) day period, Purchaser, may decline to close and shall be entitled to a refund of its deposit . . . .

Except as otherwise specifically stated herein, *acceptance of the deed by the Purchaser shall conclusively establish the full satisfaction and discharge of all obligations of Seller under this Agreement.* (emphasis added).

Also relevant to this lawsuit is Section 12 of the Agreement, titled *"Property Sold "As Is"."* That section states

The Property and any improvements thereto is sold and purchased in its present condition, ordinary wear and tear excepted, *and Seller shall have no obligation to alter, restore, repair or develop the Property.* The Purchaser has not relied and does not rely on any representations, facts or conditions, other than those expressly set forth in this Agreement. Without limiting the generality of the foregoing, no representations have been made or are made, or responsibility assumed by Seller, as to the condition or repair of the Property, or the value, expenses of operation, or development or income potentials thereof, or as to any fact, circumstance, thing or condition which may affect or relate to the same. Purchaser is hereby notified by Seller that asbestos-based materials were used in several applications in improvements to the Property. These may be found primarily in piping insulation. Purchaser should take reasonable precautions and follow applicable regulations to protect personnel in the event of the disturbance or removal of such material from its existing locations. Notwithstanding anything else contained herein to the contrary, Seller agrees that if the chemical storage tanks located in the plating room on the Property are not removed prior to closing, it shalldrain [sic] those tanks before it vacates the Property so that they may be removed without any special precautions or danger and so that their removal will not result in any violation of law.

Thereafter, in March 1992, New West conducted a preliminary environmental investigation of the Property to evaluate potential development options. The investigation revealed the presence of unlawful environmental contaminants, and particularly polychlorinated biphenyls ("PCB's"). By an October 21, 1992 letter New West demanded that Westinghouse provide indemnification to New West for the costs to monitor, assess, evaluate and clean-up the environmental contamination at the Property, for which it claimed Westinghouse was responsible. This demand was repeated in a November 8, 1993 letter. Westinghouse has refused to indemnify New West. New West filed this lawsuit to determine which party is liable for the costs to monitor, assess, evaluate and clean-up the environmental contamination of the Property, pursuant to: (i) CERCLA; (ii) Westinghouse's contracts of insurance; (iii) New Jersey's ECRA; (iv) New Jersey's Spill Act; (v) Strict Liability; (vi) Negligence; (vii) Fraudulent Non-disclosure; and (viii) Breach of the Covenant of Good-faith and Fair-dealing.

The Magistrate Judge to whom this case was assigned issued a Case Management Order to permit early adjudication of two issues:

I. Whether, or the extent to which, environmental liability was contractually transferred from Westinghouse to New West under the terms and conditions of the sale of the property in question; ("Contractual issue")

II. Whether Westinghouse had any responsibilities for compliance with New Jersey's Environmental Cleanup Responsibility Act ("ECRA issue").

### Westinghouse's Motion for Summary Judgment

Westinghouse asserts three theories in support of its motion for summary judgment.

The first relates to the Contractual Issue. Westinghouse contends that, legally, it, under the plain terms of the Agreement of Sale of the Property, transferred to New West, and New West assumed, all responsibility and liability associated with any environmental condition at the Property. If Westinghouse prevails on this theory, it is entitled to complete summary judgment.

The second and third theories seek partial summary judgment on the ECRA issue. More specifically, Westinghouse claims that ECRA does not apply because New West took title to the Property before December 31, 1983, when ECRA became effective, and that Westinghouse thereafter did not behave in a manner which would give rise to any ECRA liability. Finally, Westinghouse argues that even if ECRA does apply, New West's claim either is barred by its six-year statute of limitations, or the "as-is" clause.

### New West's Motion for Partial Summary Judgment

In its quest for summary judgment, New West's argument regarding the contractual issue is straightforward. It claims that Westinghouse's liability for environmental contamination was not contractually transferred "because an "as is" clause does not shield a seller of real property from liability for environmental contamination."

New West also opposes Westinghouse's view of the ECRA issue. New West concedes that it bought the Property before ECRA was enacted. However, it maintains that Westinghouse triggered ECRA because it remained on the Property as an occupant and continued to handle, store, transport and dispose of hazardous substances at the Property in 1984 and 1985. Thus, New West claims that Westinghouse's actions at the Property after ECRA's effective date subject it to that statute's liability.

### Standard for Summary Judgment

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not

rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Co. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

### Discussion/Analysis

#### Contract Issue

■ Westinghouse asserts that it bears no liability to indemnify New West for any costs of remediating environmental contamination on the Property because the contract of sale contained an "as is" clause, pursuant to which New West assumed all such liability.

Courts in this district have had several opportunities to determine the effect of an "as is" clause upon the transfer of liability for the environmental clean-up of a parcel of land subject to the clause, from the seller of land to the buyer.

District Judge Maryanne Trump Barry considered the issue in *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784 (D.N.J.1989). There, the owner of an industrial plant brought suit against the previous owner to recover costs it incurred in evaluating and responding to PCB contamination at the plant, under CERCLA, and the common law theories of strict liability, private nuisance, public nuisance and negligence. The plant in question had twice been transferred before reaching the plaintiff's hands. The agreement of sale, in each transaction, contained an "as is" clause. The defendant moved for summary judgment on plaintiff's common law strict liability claim. Judge Barry rejected the defendant's argument that the two "as is" clauses insulated it from liability for damages caused by it engaging in an abnormally dangerous activity. She stated,

> I cannot accept the proposition that a party, ignorant of the presence of an abnormally dangerous condition, may be held to have contractually assumed the risk posed by that condition merely by signing an "as is" purchase contract.

*Id.* at 803, n. 20. The court stated that under New Jersey law and the Restatement of Torts, strict liability only may be avoided by a knowing agreement to accept the risk of an abnormally hazardous activity. *Id.*

On two occasions, District Judge Alfred Wolin has had the opportunity to consider the matter. In *Allied Corp. v. Frola,* 730 F.Supp. 626 (D.N.J.1990), a successor-in-interest landowner sued its predecessor for costs associated with the clean-up of environmental damage. The court held that an "as is" clause does not defeat strict liability under CERCLA, or under common law. *Id.* at 630 (citing *T & E Industries v. Safety Light Corp.*, 227 N.J.Super. 228, 546 A.2d 570 (App. Div.1988); *Southland Corp. v. Ashland Oil,* 696 F.Supp. 994 (D.N.J.1988)). The dispositive issue is whether the buyer knowingly accepted the burden of environmental contamination, when taking property subject to an "as is" clause. *Id.* If the buyer knows of the environmental contamination, then the clause effectively absolves the seller of liability.

Judge Wolin revisited this subject in *Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345 (D.N.J.1991), where the owner of a contaminated site brought an action to recover response costs from its predecessor, pursuant to CERCLA. At issue was an assumption agreement which stated that the successor agreed to indemnify the predecessor for,

> all obligations and liabilities relating to the ... Plant or [predecessor company] arising out of claims made, or suits brought, on or after the Closing Date for (i) injury, sickness, disease or death of any person, or (ii) any damages to any property, in either case which is ultimately determined by the finder of fact to have resulted from any condition existing, substance consumed or discharged, product manufactured or action taken or omitted (such conditions, substances, products and action being hereafter in this Section 3 called 'Causes') on or after the Closing Date, whether or not such cause existed prior to the Closing Date.

The predecessor company argued that the successor, through operation of this clause, assumed liability for environmental claims arising from actions of the predecessor.

The court rejected this contention. After tracing the development of CERCLA and decisional law interpreting "as is" clauses, Judge Wolin wrote that,

in order to preclude recovery of response costs, there must be a clear provision which allocates these risks to one of the parties.... In order for the Court to interpret a contract as transferring CERCLA liability, the agreement must at least mention that one party is assuming environmental-type liabilities.

*Id.* at 358. The court found that the assumption agreement, which made no reference to environmental liabilities, did not contractually prohibit the successor's suit against its predecessor. *Id.*

Westinghouse attempts to distinguish these authorities by noting that they dealt with "as is" clauses, which standing alone, make no mention of environmental liability. Westinghouse contends that when the Agreement's section 12–containing the "as is" clause, is read in concert with section 5– which describes the nature of the title Westinghouse conveyed to New West, the *Mobay* standard is satisfied. That is to say, the oblique reference made in the Agreement's section 5 to "environmental or ecological controls ... codes, ordinances, regulations, rules, requirements and restrictions" is sufficient to constitute a transfer of environmental liability. Essentially, Westinghouse argues that because section 5 makes reference to environmental issues, New West knowingly accepted responsibility in section 12 for environmental conditions associated with the Property. Westinghouse's attempt to circumvent *Mobay* is unsuccessful. The language in section 5 does not govern nor is it related to the transfer of Westinghouse's environmental liability to New West. Rather, it refers to the nature of the title Westinghouse conveyed to New West, and more specifically, outlines the scope of the warranty contained therein. The section requires that Westinghouse provide New West with absolute fee simple title subject to environmental regulations, which might have impaired New West's title. This is not a clear manifestation of the parties' intent to transfer environmental liabilities from Westinghouse to New West. Indeed, it is not even close.

However, Westinghouse's argument continues with the allegation that notwithstanding the language of the agreement, New West knowingly assumed liability for environmental conditions. Principally, Westinghouse contends that New West's principal, Ivor Braka, was a sophisticated developer of real estate in the area, and knew that Westinghouse had used the Property as an industrial facility for a century. Moreover, New West had the opportunity, both before and after the sale, to inspect the Property. Hence, Westinghouse claims that New West knew that the Property presented environmental issues and unknown risks, and agreed nevertheless to assume them by virtue of sections 5 and 12 of the Agreement of Sale.

■ The Court declines Westinghouse's invitation to consider this extrinsic evidence to ascertain the parties intent in drafting the Agreement. It is unnecessary to examine parol evidence to construe a contract that is unambiguous. It is clear that the Agreement does not, anywhere, contain a clear statement that New West agreed to assume liability for environmental liabilities with which Westinghouse otherwise would be saddled. Had the parties intended such a transfer, it would have been easy to so provide. They did not, and the Court can not and will not alter the terms of a clearly written contract.

New West's motion for partial summary judgment on the contractual issue is granted.

Westinghouse's motion for summary judgment on the contractual issue is denied.

### ECRA Issue

New West's complaint contains eight theories under which Westinghouse purportedly is liable for the costs of environmental damage on the Property. One of these is New Jersey's Environmental Cleanup Responsibility Act, N.J.Stat.Ann. § 13:1K–6–13 (West 1992) ("ECRA"). Westinghouse contends that it is not liable to New West under ECRA, and therefore is entitled to summary judgment. New West argues otherwise, claiming summary judgment should issue in its favor.

### ECRA

It is axiomatic that whenever a law which will have *dramatic economic consequences* is passed, there exist those citizens who will

adjust their behavior in the days, even hours, before the law becomes effective, in an effort to avoid its effect. For example, when the Clinton administration announced, in the Spring of 1995, that a significant tariff would soon be imposed upon the import of Japanese luxury automobiles, many consumers rushed to purchase a new Lexus or Infiniti before such a transaction became financially implausible. New West claims that this phenomenon is precisely implicated by Westinghouse's behavior here. Specifically, New West alleges that Westinghouse engaged in industrial activity on the Property for a century, and then attempted to avoid the imminent and expensive imposition of liability for the costs of cleaning up the environmental contamination it had caused by transferring title to New West virtually on the eve of ECRA's effective date. The simple answer to that allegation is that there is no evidence of Westinghouse's "rushing to beat the gun."

ECRA became effective on December 31, 1983.[1] ECRA imposes a precondition on the closure, sale or transfer of certain properties associated with hazardous substances or wastes. Before such a property is closed, sold or transferred, the New Jersey Department of Environmental Protection ("NJDEP") must approve a cleanup plan which details the measures necessary to detoxify the property. Alternatively, the NJDEP may issue a declaration that there has been no discharge of hazardous substances or wastes on the property, or that any such discharge has been cleaned up in accordance with the procedures approved by the NJDEP and there remain no hazardous substances or wastes on the property. *See* N.J.S.A. 13:1K–6. Additionally, the closing, selling or transferring party must financially assure the cleanup of the property.

Thus, a party which owns property subject to ECRA either must have the NJDEP approve a cleanup plan or issue a declaration, whenever a "triggering event" occurs. Again, ECRA is triggered when the owner of property closes operations on it, sells or transfers it to another.

ECRA regulates the cessation of business, sale and transfer only of property which is defined as an "industrial establishment," that is

> any place of business engaged in operations which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of hazardous materials or wastes on-site, above or below ground, having a Standard Industrial Classification number within 22–39 inclusive, 46–49 inclusive, 51 or 76 as designated in the Standard Industrial Classifications Manual prepared by the Office of Management and Budget in the Executive Office of the President of the United States. . . .

N.J.S.A. 13:1K–8.

A party who is the transferee of property transferred in violation of ECRA is authorized to maintain a private cause of action for damages against the non-complying transferor, to recover the cost of ECRA compliance.

New West bases this count of its complaint upon the premise that Westinghouse triggered ECRA by continuing to store and dispose of waste on the Property after title passed to New West.

Westinghouse offers a multi-part argument that ECRA provides no basis for liability here.

### Westinghouse Already Had Sold the Property To New West Before ECRA's Effective Date

■ The first arrow Westinghouse releases from its quiver is directed to ECRA's effective date. Simply, Westinghouse claims that because the parties executed the Agreement of Sale and closed the transaction before December 31, 1983, the effective date of ECRA, ECRA was not activated. Westinghouse, in support of that contention, relies solely upon *In re Borne Chem. Co.,* 54 B.R. 126 (Bankr.D.N.J.1984). There, that court did state that premise, however; as it was tangential to the issue decided by the court, it is dictum. Moreover, New West does not

---

1. Of course, the Industrial Sites Cleanup Act, N.J.S.A. § 13:1K–6–13 ("ISRA") has replaced ECRA. However, because New West alleges that Westinghouse is liable under ECRA, reference only will be to that statute.

dispute that it assumed title to the Property before ECRA's effective date. Instead, it contends that Westinghouse is subject to ECRA because of the activities of Westinghouse on the Property after its transfer to New West, and after ECRA became effective: New West claims that Westinghouse triggered ECRA by its post-sale actions.

That Westinghouse had divested itself of title to the Property before ECRA's effective date does not require judgment in its favor.

### Westinghouse's Post–Sale Activity on The Property

But Westinghouse is liable only if the Court concludes that it was an "operator" of a waste-generating industrial site and thereafter ceased such operations, triggering ECRA. What exactly did Westinghouse do on the Property after December 31, 1983? New West claims, and the facts submitted indicate, that Westinghouse leased the Property from New West for a period of one year. A Westinghouse employee, C.J. "Mike" Michelini, maintained an office on the Property during January and February, 1984. Westinghouse employed CECOS International, Inc. to remove products and equipment from the Property during 1984, including hazardous wastes such as trichloromethane, toluene, phosphoric acid, nitric acid, hydrochloric acid and benzene. For example, 256 drums of material was removed from the Property by CECOS in January and February of 1984, some of these materials were registered on a New York State "Hazardous Waste Manifest." New West claims that the removal operation by CECOS continued in June of 1984, when three drums of benzene were taken, and in March of 1985, when more drums of material were transported from the Property.

New West directs the Court to two cases which purportedly provide the benchmark for determining whether Westinghouse's post-transfer activities subject it to liability: *In re the Applicability of ECRA to GAF Building Materials Corporation Facilities Located in Gloucester City, New Jersey,* (Slip. op. April 12, 1989, Superior Court of New Jersey, App. Div., No. A–4401–87T2), *certif.den.,* 117 N.J. 68 (1989) ("GAF I"); and *In re the Applica-*

*bility of ECRA to GAF Building Materials Corporation Facilities Located in Gloucester City, New Jersey* (Slip. op. January 6, 1992, Superior Court of New Jersey, App.Div., No. A–4116–89T1) ("GAF II").

Those cases dealt with the issue of whether GAF, which owned four contiguously-located industrial sites, was liable under ECRA, where it had ceased its primary operation of manufacturing and distributing products before ECRA's effective date, but continued to store hazardous waste on the property afterwards. In GAF II, the court noted that ECRA is activated by, among other things, a "closing." It observed that the statute defined closing as the "cessation of all operations which involve ... storage ... of hazardous substances and wastes." *See GAF II* at p. 4 (citing N.J.S.A. 13:1k–9). The court found that GAF continued to store and handle hazardous substances in its warehouses until some time in 1984. The court therefore held that ECRA was engaged when that activity ceased. *Id.*

Again, in *Matter of Fabritex Mills, Inc.,* 231 N.J.Super. 224, 555 A.2d 649 (App.Div. 1989), the court considered whether an actor's activities on a property provoked ECRA. Fabritex was in the business of custom coating fabric with plastic and then distributing those products on the wholesale market. Its operations were headquartered in five rented buildings of an industrial park. An employee of the NJDEP, while visiting another building in the industrial park, noted that Fabritex's buildings had been vacated. The NJDEP wrote to Fabritex, stating that it had been advised that Fabritex had ceased its operations at the industrial park, thereby triggering ECRA. The NJDEP stated that because ECRA was triggered by Fabritex's cessation of operations, and Fabritex had neither submitted a Cleanup Plan, nor obtained a Negative Declaration, Fabritex was in violation of the Act.

Fabritex took the position that ECRA had not been engaged, because it had not really terminated its operations at the industrial park. Fabritex admitted that it had fully ceased its manufacturing operations at the plant. However, it claimed that ECRA was not triggered because it continued to use its

site as a storage facility for materials earlier used in the manufacturing operation. Approximately 100 drums of dioctyl phthalate were left behind on the site after Fabritex's manufacturing activities ended. The facts indicated that the remaining drums were unguarded, left in an unlocked area and the content labels on the drums were scrubbed off. The issue presented was whether a facility which had ceased manufacturing operations but continued a storage facility for hazardous substances was subject to ECRA, when the storage ceased.

The court held that ECRA was triggered when Fabritex ceased "substantially all" of its operations, which occurred when it stopped manufacturing and distributing its products. The court also concluded that Fabtritex's act of leaving the 100 drums of waste at the site did not constitute "storage" within the ambit of ECRA because it was clear that the drums were abandoned.

Here Westinghouse's post-sale close-down at the Property is sufficient to trigger ECRA. Undeniably, like Fabritex, it ceased its manufacturing operations before ECRA's effective date. Yet, its activity on the Property after the effective date, December 31, 1983 was more extensive than that of Fabritex. Westinghouse did not merely abandon some hazardous material on the Property. Westinghouse remained on the Property as a tenant for a period of one year. A Westinghouse employee was there through February, 1984 to supervise Westinghouse's close-down operations. The hazardous materials remaining on the Property were not abandoned, but rather, were the subject of a contract for removal between Westinghouse and CECOS International. The removal of at least 256 drums of hazardous waste from the Property was supervised by Westinghouse in January and February of 1984. This activity concerning hazardous waste was sufficient to make Westinghouse an "operator" under ECRA. When Westinghouse finally ceased the operation of this waste storage and removal, ECRA was engaged.

### Statute of Limitations

Nonetheless, Westinghouse argues that, even if ECRA was triggered, New West's claim is barred for not being timely filed. ECRA does not contain a statute of limitations. Westinghouse contends that the Court should adopt the period of limitation of six years which is imposed in actions based upon breach of contract or for common-law tort environmental claims. *N.J.S.A.* 2A:14–1. Westinghouse claims that any failure to comply with ECRA occurred within 5 days of its cessation of waste removal activity at the Property, which either was in late 1984 or early 1985. Hence, New West's lawsuit, filed in 1994, is legally late.

On the other side, New West claims that because there is no statute of limitations contained in the statute, the Court should not engraft one. It asserts that because the NJDJEJP, the state administrative agency empowered to enforce ECRA, is not bound by a statute of limitations, nor should New West, which sues as a private citizen, be. However, the principle of *nullum tempus occurrit regi*, presently defined as "time does not run against the state," is not always applicable to a private actor. The *nullum tempus* doctrine was fashioned at common law and, literally in Latin, means "time does not run against the king." *See Rutgers v. Grad Partnership,* 269 N.J.Super. 142, 634 A.2d 1053 (App.Div.1993) (citing *Devins v. Bogota,* 124 N.J. 570, 575, 592 A.2d 199 (1991)). A rationale for the principle is that "the king has established his own rules for litigation." *Id.* A more pertinent basis is that "the king [and now State] was too busy protecting the interests of his people to keep track of his [its] lands and to bring suits to protect them in a timely fashion." *Id.* Conversely, a private actor such as New West is not charged with maintaining the welfare of any entity other than itself. Application of the concept of *nullum tempus* to allow New West's claim is not necessary to protect the public interest and does not here obtain. There should be a statute of limitations when a private actor brings suit under ECRA.

Accordingly, the Court first must determine the appropriate statute of limitation in actions brought by private parties under ECRA, and then determine whether New West's suit was timely filed.

New Jersey's Spill Act, N.J.S.A. 58:10–23.11, *et.seq.*, a comprehensive remedial environmental scheme similar to ECRA, was enacted in 1976,

> to control the transfer and storage of hazardous substances and to provide liability for damage sustained within [New Jersey] as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution.

N.J.S.A. 58:10–23.11a. The Spill Act contains no statute of limitations for private contribution actions. In these circumstances, courts are directed to select a limitations period from among those statutes of limitation for actions seeking comparable relief at common law. *See Kemp Indus., Inc. v. Safety Light Corp.,* No. 92–95, 1994 WL 532130 at \*27 (D.N.J.1994) (citing *Skadegaard v. Farrell,* 578 F.Supp. 1209, 1214 (D.N.J.1984); *Montells v. Haynes,* 133 N.J. 282, 292, 627 A.2d 654 (1993); *White v. Johnson & Johnson Products, Inc.,* 712 F.Supp. 33, 37 (D.N.J.1989)).

A private cause of action by a transferee of land against the transferor for failing to comply with ECRA is most analogous to a common law environmental tort action, which must be commenced within six years of its accrual. *See Hatco Corp. v. W.R. Grace Co.,* 801 F.Supp. 1309, 1323 (D.N.J.1992). Courts have fashioned this six-year period of limitations to similar Spill Act claims. *See Kemp* at \*27. New West's lawsuit was filed on March 8, 1994. Its ECRA claim against Westinghouse is barred therefore, unless it arose after March 8, 1988.

New West asserts that its claim cannot be barred by any statute of limitations because Counts 8 and 9 of its Complaint allege that Westinghouse engaged in fraud by concealing the existence of environmental reports it had prepared in 1983. Generally, New Jersey law provides that where a plaintiff claims that there has been fraudulent concealment of facts underlying a potential cause of action, the period of limitations does not commence until the plaintiff discovers the wrong. *See, e.g., Foodtown v. Sigma Marketing,* 518 F.Supp. 485 (D.N.J.1980); *Lopez v. Swyer,* 62 N.J. 267, 275 n. 2, 300 A.2d 563

(1973); *Kyle v. Green Acres at Verona,* 44 N.J. 100, 109, 207 A.2d 513 (1965).

This is a motion for summary judgment and, at this stage, New West is not entitled merely to rest upon the allegations in its complaint. New West has not directed the Court to anything factual which indicates a competent and relevant basis for a finding that Westinghouse fraudulently concealed non-compliance with ECRA, particularly since the alleged 1983 reference predates the 1984–85 activity which triggered the statute.

Finally, even if a six-year statute of limitations is applied, New West maintains that its Complaint still was timely filed under application of the "discovery rule." The discovery rule is an equitable principle delaying the accrual of a cause of action until the injured party discovers it may have the basis of an actionable claim. *See Vispisiano v. Ashland Chemical Co.,* 107 N.J 416, 426, 527 A.2d 66 (1987). The discovery rule has been applied in certain contexts. *See, e.g., Kemp Industries, Inc. v. Safety Light Corp.,* 1994 WL 532130 (D.N.J.1994); *Allied Corp. v. Frola,* 730 F.Supp. 626 (D.N.J.1990); *Enertron Industries v. Mack,* 242 N.J.Super. 83, 576 A.2d 28 (App.Div.1990). Here, however, New West has not furnished the Court with evidential justification to apply the discovery rule.

When did New West's cause of action against Westinghouse arise? At the latest, it was that time in March, 1985 when New West discovered drums which had been left behind by CECOS, Westinghouse's hired mover. New West had then until the appropriate day in March, 1991 to file suit. This action was commenced three years past that time; it had become legally stale.

Westinghouse's motion for partial summary judgment on the ECRA Issue is granted.

### ECRA Only Applies to an Industrial Site

Finally, Westinghouse contends that it is not liable under ECRA because the Property was not an "industrial site" after December 31, 1983. ECRA defines whether property is industrial, and therefore subject to its provisions, based upon its SIC number. Westing-

house claims that New West has not proven that the SIC number the Property was assigned subjects it to ECRA.

New West asks the Court to take judicial notice of the SIC number of the Property as reported in two publications: the New Jersey Directory of Manufacturers and Mac-Rae's New Jersey State Industrial Directory. In a supplemental brief submitted, with leave of the Court, after this motion already was briefed, Westinghouse attacks the reliability of these publications, claiming that they cannot provide an appropriate basis upon which judicial notice of a fact may be taken. At the least, Westinghouse contends that a genuine factual dispute exists as to whether the Property was an "industrial site" after ECRA became effective.

The dispute is governed by Federal Rule of Evidence 201(b) which provides that

> A judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Fed.R.Evid. 201(b).

 Westinghouse correctly notes that the mere fact of publication does not perforce qualify a source as sufficiently accurate so as to form a basis for judicial notice. Westinghouse contends that the publications in question lack reliability because they contain disclaimers of responsibility for errors or omissions and lack appropriate verification procedures.

However, because the Court already has determined that New West's action is time-barred, this issue need not be decided.

### Conclusion

This motion has been bifurcated into a "Contractual Issue" and an "ECRA Issue." For reasons stated above:

Westinghouse's motion for summary judgment on the Contractual Issue is DENIED.

New West's motion for partial summary judgment on the Contractual Issue is GRANTED.

Westinghouse's motion for partial summary judgment on the ECRA Issue is GRANTED.

New West's motion for partial summary judgment on the ECRA Issue is DENIED.

An appropriate order follows.

### ORDER

This matter is before the Court on cross motions for partial summary judgment and summary judgments, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

For good cause having been shown, and based upon the written submissions and oral argument of the parties, it is on this 21st day of November 1995, ORDERED that, in accordance with the issues having being so designated in the opinion accompanying this order,

> Westinghouse's motion for summary judgment on the Contractual Issue is DENIED.
>
> New West's motion for partial summary judgment on the Contractual Issue is GRANTED.
>
> Westinghouse's motion for summary judgment on the ECRA Issue is GRANTED.
>
> New West's motion for partial summary judgment on the ECRA Issue is DENIED.